**UNITED STATES of America,**

v.

**Albert ROSS, Jr., Appellant.**

**No. 79–1624.**

United States Court of Appeals, District of Columbia Circuit.

Argued en banc Oct. 23, 1980.

Decided March 31, 1981.

Certiorari Granted Oct. 13, 1981. See 102 S.Ct. 386.

William J. Garber, Washington, D. C. (appointed by this court) for appellant.

John R. Fisher, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., and John A. Terry, Asst. U. S. Atty., Washington, D. C., were on the brief, for appellee. Bobara E. Liles, Asst. U. S. Atty., Washington, D. C., also entered an appearance for appellee.

Michael E. Geltner, Washington, D. C., and Larry J. Ritchie, Washington, D. C., filed a brief as amicus curiae on behalf of the Appellate Litigation Clinic of Georgetown University.

Before McGOWAN, Chief Judge, and WRIGHT, TAMM, ROBINSON, MacKIN-NON, ROBB, WILKEY, WALD, MIKVA, EDWARDS, and GINSBURG, Circuit Judges.

Opinion for the court filed by Circuit Judge GINSBURG, in which Chief Judge McGOWAN, and Circuit Judges WRIGHT, ROBINSON, WALD, MIKVA, and EDWARDS concur.

Separate opinion, dissenting in part, filed by Circuit Judge TAMM, in which Circuit Judge ROBB concurs.

Dissenting opinion filed by Circuit Judge MacKINNON.

Dissenting opinion filed by Circuit Judge ROBB.

Dissenting opinion filed by Circuit Judge WILKEY.

GINSBURG, Circuit Judge:

In *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), the Supreme Court settled the question whether police officers, in the absence of exigent circumstances, are required to obtain a warrant before opening and searching luggage, large or small, locked or unlocked, taken from an automobile properly stopped and searched for contraband. The Court held that absent a warrant, such searches violate the Fourth Amendment, even when the luggage has been lawfully seized. The case before us raises the question whether *Sanders* establishes only a "luggage rule" or whether the reasoning of that decision extends as well to other containers used to carry personal belongings and effects, containers smaller, less solid, or less durable than those on sale in a luggage shop.[1]

---

1. The Supreme Court has granted *certiorari* in two search and seizure cases involving differ-

ent, but related, issues: *People v. Robbins*, 103

The two items initially in contention in this case were a closed but untaped brown paper bag and, lying alongside it in the trunk of defendant Ross's car, a zippered red leather pouch. The Government successfully opposed a motion to suppress the evidence found in both containers, heroin in the paper bag, cash in the leather pouch. Although it earlier argued that both bag and pouch were subject to warrantless search,[2] the Government, despite its success in the trial court, now concedes that the pouch is covered by the rule in *Sanders*.[3] It continues to urge, however, that a paper bag does not merit classification as a protected repository for personal effects.

We conclude that *Sanders* did not establish a "worthy container" rule encompassing bags of leather but not of paper. Rather, it appears to us that *Sanders* reaffirmed the Supreme Court's longstanding position regarding the centrality of the warrant requirement to Fourth Amendment administration: absent a "specifically established and well-delineated" exception, a warrantless search is *per se* impermissible. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031–32, 29 L.Ed.2d 564 (1971); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973).

No specific, well-delineated exception called to our attention permits the police to dispense with a warrant to open and search "unworthy" containers. Moreover, we believe that a rule under which the validity of a warrantless search would turn on judgments about the durability of a container would impose an unreasonable and unmanageable burden on police and courts.[4] For these reasons, and because the Fourth Amendment protects all persons, not just those with the resources or fastidiousness to place their effects in containers that decisionmakers would rank in the luggage line, we hold that the Fourth Amendment warrant requirement forbids the warrantless opening of a closed, opaque paper bag to the same extent that it forbids the warrantless opening of a small unlocked suitcase or a zippered leather pouch.

Part I of this opinion states the facts that give rise to this controversy; Part II deals with threshold issues the Government has raised—belated challenges to the retroactivity of *Sanders* and to Ross's standing to seek suppression of the evidence found in the paper bag; Part III concerns the scope of *Sanders* and the application of its holding and reasoning to this case.

I.

On November 27, 1978, Detective Charles Marcum of the Washington, D.C., Metropol-

Cal.App.3d 34, 162 Cal.Rptr. 780 (1980), *cert. granted*, 449 U.S. 1109, 101 S.Ct. 916, 66 L.Ed.2d 838 (1981); *People v. Belton*, 50 N.Y.2d 447, 407 N.E.2d 420, 429 N.Y.S.2d 574 (1980), *cert. granted*, 449 U.S. 1109, 101 S.Ct. 917, 66 L.Ed.2d 838 (1981). In *Robbins*, application of the warrant exception for containers whose contents can be inferred from the packaging divided the lower court; in *Belton*, the scope of a search incident to an arrest is at issue.

2. Brief for Appellee at 17 n.9 (urging that *Sanders* applies only to luggage and that neither pouch nor bag "is considered luggage in the sense that luggage is commonly known").

3. On April 17, 1980, a divided panel of this court held: 1) the currency found in the pouch should have been suppressed as evidence; 2) the Fourth Amendment does not forbid the police from opening a closed but untaped paper bag once it is properly in their hands. Had Ross "sealed the paper bag shut," however, the panel majority would have held a search war-

rant required. *See* p. 1163, *infra*. The panel decision was later vacated and a rehearing en banc was held on October 23, 1980. In a brief prepared for the en banc hearing, the Government first argued that *Sanders* should not be applied retroactively. *See* pp. 1162–64, *infra*. But if *Sanders* applies to this case, the brief continued, the Government does not contest that the pouch is "the type of luggage contemplated by *Sanders*." Supplemental Brief for Appellee at 7.

4. Similarly difficult to administer, we think, is the protection the panel majority would have accorded a person's legitimately seized paper bag sometimes. The panel majority distinguished between paper bags closed merely by folding a flap and bags sealed shut. It also distinguished the paper bag found in a car trunk "amidst suitcases" from one not surrounded by luggage. Slip op. at 15–16 n.6.

itan Police Department received a telephone call from an informant who on prior occasions had provided reliable information about narcotics trafficking. The informant told Marcum that he had observed a man known as "Bandit" selling narcotics in front of 439 Ridge Street, N.W.; he furnished a detailed description of "Bandit" and reported that the drugs were in the trunk of Bandit's automobile, a maroon two-door Chevrolet Malibu with District of Columbia license plates.

Detective Marcum, Detective David Cassidy, and Sergeant Raymon Gonzales drove to Ridge Street where they observed a car matching the informant's description. A radio check revealed that the car was registered to an Albert Ross, Jr., whose nickname was "Bandit." The police officers passed through the area twice, then spotted Ross driving the car. After stopping the vehicle and identifying themselves, the police asked Ross to step out of his car. Ross matched the description the informant had given Marcum. As Marcum conducted a body search, Gonzales observed a round of ammunition on the car's front seat. Gonzales retrieved the round, searched the inside of the car for weapons, and found a pistol in the glove compartment. Marcum arrested Ross and handcuffed him; Detective Cassidy then unlocked and searched the car's trunk. He found in it side by side a closed but unsealed brown paper sack about the size of a lunch bag and a zippered red leather pouch. Cassidy immediately opened the paper bag and discovered inside a quantity of glassine envelopes containing a white powder. Leaving the bag and the pouch in the trunk, the officers drove Ross's car to police headquarters. At the station, Cassidy reopened the paper bag, determined that it contained thirty glassine envelopes, and sent the envelopes to the police laboratory for analysis; the laboratory later reported that the envelopes contained heroin. Cassidy also opened the leather pouch and found inside $3200 in currency. At no point in the episode did the officers seek a search warrant.

On December 19, 1978, a federal grand jury in the District of Columbia indicted Ross for possession of heroin, possession of heroin with intent to distribute, carrying a pistol without a license, and possessing a firearm after a felony conviction. Ross moved to suppress the evidence obtained from the search of the paper bag and the leather pouch. After a hearing, the district judge denied the motion. A jury trial followed and, on March 21, 1979, Ross was convicted of possession of narcotics with intent to distribute, in violation of 21 U.S.C. § 841(a).

## II.

### (A)

■ Although the Government did not raise the point before the panel, it argues here that *Arkansas v. Sanders* should not apply retroactively. In *United States v. Peltier*, 422 U.S. 531, 535, 95 S.Ct. 2313, 2316, 45 L.Ed.2d 374 (1975), the Supreme Court reiterated that decisions expanding the scope of the exclusionary rule should have prospective effect only. A court should not apply a decision retroactively if the "law enforcement officials [who conducted the search] reasonably believed in good faith that their conduct was in accordance with the law" in effect at the time of the search. *Id.* at 538, 95 S.Ct. at 2317 (emphasis deleted). If, however, a decision does not expand the exclusionary rule, but merely restates and applies doctrine already in place, then law enforcement officers must be charged with knowledge of that doctrine before the explanative decision issues. The Supreme Court in *Sanders* indicated that no new constitutional principle was at stake. On the contrary, the Court styled its opinion as a recapitulation of the theme exposed in *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). Therefore we cannot seek refuge in *Peltier* to justify a declaration that *Sanders* commands only prospective adherence.

Justice Powell's opinion for the Court in *Sanders* signals that the decision, affirming the judgment of the Supreme Court of Arkansas, breaks no new ground. The open-

ing paragraph announces a purpose to elaborate, not to alter, existing doctrine: "We took this case . . . to resolve some apparent misunderstanding as to the application of our decision in *United States v. Chadwick* . . . ." 442 U.S. at 754, 99 S.Ct. at 2588. Summing up in *Sanders*, Justice Powell declared that the Court found "no justification for the extension of [*Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925)] and its progeny to the warrantless search of one's personal luggage merely because it was located in an automobile lawfully stopped by the police." *Id.* at 765, 99 S.Ct. at 2594. Justice Powell, therefore, indicated that a majority of the Court believed that a decision contrary to the one reached in *Sanders*, rather than the one there made, would have altered prior law.[5]

Between *Chadwick* and *Sanders*, moreover, at least four courts held that *Chadwick* rendered unlawful the warrantless search of luggage seized from a car.[6] These rulings contrast with pre-*Chadwick* decisions, which held consistently that no warrant was required to search luggage seized from a car.[7] The shift in the trend of lower court decisions after *Chadwick* thus anticipated the Supreme Court's signification in *Sanders* that *Chadwick*, not *Sanders*, was the path-marking decision.

For these reasons we conclude that *Arkansas v. Sanders* did not augment, but simply explained and applied, doctrine

welded in place since *Chadwick*—doctrine that Detective Cassidy knew or should have known when he searched the containers found in the trunk of Ross's car. We therefore reject the Government's belated argument and join the numerous courts that have held *Sanders* retroactively applicable at least to searches conducted after *Chadwick*.[8] *United States v. Dien*, 609 F.2d 1038 (2d Cir. 1979), *adhered to on petition for rehearing*, 615 F.2d 10 (2d Cir. 1980); *United States v. Medina-Verdugo*, 637 F.2d 649 (9th Cir. 1980); *United States v. MacKay*, 606 F.2d 264 (9th Cir. 1979); *State v. White*, 94 N.M. 687, 615 P.2d 1004, 1006 (Ct.App. 1980) (argument that *Sanders* does not apply retroactively is "spurious"); *Abell v. Commonwealth*, 221 Va. 607, 272 S.E.2d 204 (1980); *cf. United States v. Bulgier*, 618 F.2d 472 (7th Cir.) (assuming retroactive application of *Sanders* and upholding search), *cert. denied*, 449 U.S. 843, 101 S.Ct. 125, 66 L.Ed.2d 51 (1980). *But cf. State v. Hatami*, No. A–1567–77 (N.J.Super. Ct.App.Div. Nov. 21, 1979) (per curiam) (unpublished opinion) (refusing to apply *Sanders* retroactively to a pre-*Chadwick* search), *certification denied*, 85 N.J. 471, 427 A.2d 567, *cert. denied*, 449 U.S. 1035, 101 S.Ct. 610, 66 L.Ed.2d 496 (1980).

We note, finally, that doubt some courts and commentators expressed, in the wake of *Chadwick*, about whether the police needed a warrant to search closed containers seized from a car, cannot justify Detec-

---

**5.** Judge Wilkey's dissenting opinion, *post*, at 1188–90, urges that the Supreme Court's opinion in *Peltier* precludes this court from asking whether *Sanders* declared new law. It is true that the Court in *Peltier* did not set out this consideration as a separate inquiry, directing the courts instead to ask whether the police officer knew or should have known that his conduct was in accordance with the law. We believe, however, that the former inquiry is subsumed in the latter. If a decision develops no new law, then the police officer—who is charged with knowledge of the old law—should have known, and acted in a manner consistent with, the core doctrine.

**6.** *United States v. Stevie*, 582 F.2d 1175 (8th Cir. 1978) (en banc), *cert. denied*, 443 U.S. 911, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979); *United States v. Vallieres*, 443 F.Supp. 186 (D.Conn. 1977); *Sanders v. State*, 262 Ark. 595, 559

S.W.2d 704 (1977), *aff'd sub nom. Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979); *Shingleton v. State*, 39 Md.App. 527, 387 A.2d 1134 (1978). Indeed, the Court in *Sanders* noted that the Supreme Court of Arkansas had found *Chadwick* "virtually controlling" on the questions *Sanders* presented. 442 U.S. at 762, 99 S.Ct. at 2592.

**7.** *See, e. g., United States v. Tramunti*, 513 F.2d 1087, 1104–05 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *United States v. Soriano*, 497 F.2d 147 (5th Cir. 1974) (en banc); *United States v. Evans*, 481 F.2d 990, 993–94 (9th Cir. 1973).

**8.** *Chadwick* was decided on June 21, 1977. The searches in this case occurred on November 27, 1978. *Sanders* was decided on June 20, 1979.

tive Cassidy's failure to obtain a search warrant before opening the paper sack and leather pouch found in Ross's car. The Supreme Court has firmly held that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). That declaration indicates doubts police officers may entertain are to be resolved in favor of, not against, the main rule that a warrant precede a search. We cannot invert the Supreme Court's instructions by sanctioning police conduct of warrantless searches, subject only to the courts' prior express mandate that they obtain a warrant. Rather, we are required to adhere to the Court's command that the police obtain a warrant unless their search falls within one of the express and narrowly drawn exceptions to the warrant requirement. Read against this background, the Court's statement in *Peltier,* that a retroactivity ruling is impermissible when a police officer believes "in good faith" that his conduct is "in accordance with the law," 422 U.S. at 538, 95 S.Ct. at 2318, must mean that Detective Cassidy had to believe, in good faith, that his conduct fell within one of the few, jealously drawn exceptions to the warrant requirement. In sum, if Detective Cassidy had doubts about the meaning of *Chadwick,* he should have followed the presumption laid down in numerous Supreme Court decisions and obtained a warrant.[9] His doubts, even af-

ter *Peltier,* should not have been resolved against the warrant requirement.[10]

(B)

■ A second preliminary issue not previously raised by the Government concerns Ross's "standing." In contrast to its position regarding *Sanders,* the Government here champions retroactivity, specifically, the retroactivity of the Supreme Court's decision in *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980).

When Ross moved to suppress the evidence obtained from the search of the pouch and bag, and when his case was tried, the "automatic standing" rule of *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), governed lower courts. Under *Jones,* a defendant charged with a crime of possession was entitled to claim "automatic standing" to challenge the legality of a search that produced evidence against him. Ross therefore did not testify at the suppression hearing and the Government raised no objection to his silence.

The Government's evidence at trial was substantially the same as the evidence it presented at the hearing on the motion to suppress. The police described the circumstances surrounding the arrest of Ross, including the attendant searches of the pouch and bag. Having lost the suppression motion, Ross defended at trial by denying knowing anything about packets of narcotics in a paper bag in the trunk of his car.

---

9. Judge Tamm expresses this point admirably in his opinion dissenting in part: "In any situation approaching a borderline case, the police would best be cautious, and obtain a proper search warrant before proceeding." *Post,* at 1161 n.6.

10. In *Peltier,* by contrast, the Court found that roving border patrol searches had received "continuous judicial approval" before *Almeida-Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), the decision that was there denied retroactive effect. 422 U.S. at 541, 95 S.Ct. at 2319, Justice Powell's opinion for the Court in *Almeida-Sanchez* had recognized that these searches "ha[d] been con-

sistently approved by the judiciary" and presented a "question ... of first impression" to the Supreme Court. 413 U.S. at 278, 93 S.Ct. at 2542, *quoted in Peltier,* 422 U.S. at 541, 95 S.Ct. at 2319. Police officers conducting roving border patrol searches before *Almeida-Sanchez,* therefore, did not have doubts about the constitutionality of their conduct; that conduct had been consistently approved by the federal courts. As explained above, however, *Chadwick* and the lower court decisions following it must have at least created a substantial doubt about the constitutionality of warrantless searches of closed containers seized from automobiles.

After the initial hearing and decision of this appeal [11] the Supreme Court overruled *Jones v. United States*. In *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), the Court held that defendants charged with crimes of possession may claim the benefits of the exclusionary rule only if they first establish that their own Fourth Amendment rights have been violated. Relying on *Salvucci*, the Government now asserts for the first time that Ross, by his tactic at trial, coupled with his silence at the suppression hearing, forfeited any claim that his own Fourth Amendment rights were violated. Ross's professed ignorance of the narcotics-filled paper bag in his trial testimony, the Government argues, pinions him. He cannot now be heard to claim that he secreted the bag in the trunk, hence he cannot satisfy the *Salvucci* requirement.

But the Supreme Court in *Salvucci* did not rule that *Jones* was overruled retrospectively. In fact, the Court noted that *Jones* bound the lower courts until it said otherwise. 448 U.S. at 85, 100 S.Ct. at 2550. In contrast to *Sanders*, which was a confirming and clarifying decision, *Salvucci* was a forthright overruling of prior High Court precedent.[12]

In *Salvucci* itself the Government had challenged the defendant's "standing" from the start. No such challenge was raised in the case before us. We decline to transform this case into the "Catch-22" the Government proposes. Had the Government raised a standing question at the suppression hearing, Ross and his counsel would have been alerted to the risk of Ross's remaining silent and failing to assert that both pouch and bag were items under

his exclusive possession and control until he encountered the police. More significant in view of the context in which the case comes to us, had the district court granted the suppression motion, as we believe it should have, there would have been no trial and no testimony from Ross denying knowledge of the bag found in his trunk.

The unfairness of now saddling Ross with the rule in *Salvucci* rather than the one in *Jones* is evident.[13] Ross's positions, his silence at the suppression hearing and his testimony at trial, should not be judged by a rule that did not exist until after his hand had been fully played. We therefore hold that *Jones*, not *Salvucci*, provides the "standing" rule that governs this case.

Moreover, even if Ross's standing were now to be determined under the *Salvucci* test, we could not accept the Government's position that his trial tactic, denying knowledge of the bag, strips him of Fourth Amendment protection. The jury found Ross guilty beyond a reasonable doubt. To make that determination the jury necessarily concluded that the narcotics-filled bag belonged to Ross. To reach that conclusion, the jury had to reject Ross's attempt at trial to suggest that someone else might have placed the bag in the trunk of the car. The jury's verdict, we believe, resolves any issue whether the bag belonged to Ross—it did. In view of the jury determination, the Government cannot argue sensibly that the bag was Ross's for purposes of the conviction, but someone else's for Fourth Amendment purposes.

It may be, however, that in emphasizing Ross's trial testimony, the Government does not seriously challenge Ross's exclusive control and possession of the narcotics-filled

---

11. *See* note 3 *supra*.

12. Under the criteria set forth in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 105–07, 92 S.Ct. 349, 354–56, 30 L.Ed.2d 296 (1971), *Salvucci* should not apply retroactively to cases on direct appeal where the prosecution failed to challenge the defendant's "standing" at the suppression hearing. While *Chevron* was a civil case, its reasoning is fully applicable in this context. *United States v. Bowen*, 500 F.2d 960, 975 n.1 (9th Cir. 1974) (en banc), *aff'd*, 422 U.S. 916, 95

S.Ct. 2569, 45 L.Ed.2d 641 (1975). *See also Linkletter v. Walker*, 381 U.S. 618, 627, 85 S.Ct. 1731, 1736, 14 L.Ed.2d 601 (1965).

13. *See Cipriano v. City of Houma*, 395 U.S. 701, 706, 89 S.Ct. 1897, 1900, 23 L.Ed.2d 647 (1969). Even the Government backs away, finding it "understandable" that Ross did not forecast *Salvucci* while his case was before the district court. Supplemental Brief for Appellee at 12 n.6.

bag prior to his apprehension by the police. Rather, the Government may be asserting that standing requires an expectation of privacy, which Ross's trial testimony, "There wasn't supposed to be no paper bag in [the car trunk]," defeats. But given the jury verdict, we must take it to be fact that there was supposed to be a paper bag in the trunk and Ross put it there. The Government now concedes that Ross had an adequate expectation of privacy in the currency-filled pouch. We find it difficult to comprehend why that same expectation would not attend a contraband-filled closed container Ross secreted in the locked trunk alongside the pouch.[14]

### III.

■ Turning to the application of Supreme Court precedent in point, most immediately, *Arkansas v. Sanders*, we find only two arguable bases for the warrantless searches of Ross's pouch and bag. First, in *Sanders*, as in *Chadwick*, police suspicion related to the containers, not to the vehicles in which they were placed. In this case, the informant told the police that Ross had narcotics in the trunk of his car. No specific container was identified. Conceivably, we could distinguish those cases in which the police focus their suspicion on the container from those in which the vehicle or an integral part of it attracts police attention.[15] Second, *Chadwick* and *Sanders* might be cubbyholed as luggage cases, decisions applying the Fourth Amendment warrant requirement to effects placed in durable containers, with no carryover to effects put in less stable packets.

As we explain further below, we believe the first of these two bases is precluded by the Court's statement of the "misunderstanding" it sought to resolve in *Sanders*. Moreover, we note that the Government does not urge that we distinguish searches based on police suspicion directed to a vehicle or an integral part of it, from those in which suspicion focuses on a particular container carried in the vehicle. For such a distinction, applied to this case, would render the pouch as vulnerable to warrantless search as the bag, and the Government now concedes that under the *Sanders* decision, a warrant is prerequisite to exposing the contents of the pouch.

The second basis is pressed by the Government and has attracted several courts.[16] But just as the Supreme Court was unable to tie to the Fourth Amendment warrant requirement any "established, well-delineated" exception for luggage, we are unable to perceive such an exception for packets less resistant than luggage to hard wear and frequent use.

We discuss below in more detail each of the two possible bases for reading out of this case the Fourth Amendment warrant requirement.

### (A)

In *Sanders*, local police received a tip that a passenger on a designated flight due in at the municipal airport would be carrying a small green suitcase containing marijuana. The police observed the passenger's departure from the terminal, green suitcase in tow, and the placement of the suitcase in the trunk of a taxicab. The taxi drove off

---

14. *See* text at pp. 1170–71 and notes 31, 33, and 34 *infra*.

15. *Cf. Arkansas v. Sanders, supra,* 442 U.S. at 766–68, 99 S.Ct. at 2594–97 (Burger, C. J., concurring).

16. *E. g., United States v. Mannino,* 635 F.2d 110 (2d Cir. 1980) (plastic bag); *United States v. Mackey,* 626 F.2d 684 (9th Cir. 1980) (paper bag); *United States v. Blair,* 493 F.Supp. 398, 416 (D.Md.1980) (cardboard boxes). *Cf. United States v. Brown,* 635 F.2d 1207 (6th Cir. 1980); *United States v. Jimenez,* 626 F.2d 39, 41 (7th Cir. 1980) (no expectation of privacy in paper

bag on facts of this case, but facts in another case could show such an expectation), *cert. granted,* — U.S. —, 101 S.Ct. 3152, 69 L.Ed.2d 1000 (1980); *United States v. Goshorn,* 628 F.2d 697 (1st Cir. 1980) (remand for evidence whether defendant had expectation of privacy in paper bags). Several of the recent decisions distinguishing containers more or less closely resembling luggage (purses, wallets, guitar cases) from plastic or paper sacks cite the analysis in the now vacated panel decision in this case, which distinguished leather pouch from paper bag.

and was stopped by pursuing officers several blocks from the terminal. At police request, the taxi driver opened the trunk. The police then seized the green suitcase, which was unlocked, opened it, and found inside ten marijuana packets. The Supreme Court affirmed the decision of the Supreme Court of Arkansas holding that the trial court should have suppressed the marijuana because it was obtained through an unlawful search of the suitcase.

The Court granted certiorari in *Sanders* to resolve "some apparent misunderstanding" among lower courts about the application of *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).[17] *Chadwick* held that a footlocker placed in the trunk of an automobile parked at a curb could lawfully be taken into police custody, because the police had probable cause to believe it contained contraband, but could not lawfully be searched without a warrant. To illustrate the post-*Chadwick* misunderstanding among lower courts, the Supreme Court cited *United States v. Finnegan*, 568 F.2d 637, 641–42 (9th Cir. 1977), and *United States v. Stevie*, 582 F.2d 1175, 1178–79 (8th Cir. 1978) (en banc), *cert. denied*, 443 U.S. 911, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979).

In *Finnegan*, the car, not a particular container in it, originally attracted police attention.[18] In *Stevie*, the police suspicion related to baggage placed in a car, not to the vehicle in which the luggage was carried.[19] The Ninth Circuit panel in *Finnegan* reasoned that *Chadwick* was inapplicable when car rather than container was the object of suspicion. Instead, the *Finnegan* court held, *Chambers v. Maroney*, 399

U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), controlled. *Chambers* upheld the "automobile exception" to the warrant requirement; it sustained the constitutionality of a warrantless search of a vehicle on a street or highway when the police have probable cause to believe the vehicle contains contraband or evidence of crime. The *Finnegan* court pointed out that if *Chadwick*, not *Chambers*, applied, then police could search without a warrant for a brick of marijuana lying inside a car trunk, but not for one inside a suitcase in the trunk. 568 F.2d at 641. *Stevie*, on the other hand, held *Chadwick* dispositive; in so ruling, the Eighth Circuit stated explicitly that it disagreed with the reasoning of the Ninth Circuit panel in *Finnegan*. 582 F.2d at 1179.

The Supreme Court identified *Finnegan* and *Stevie* as inconsistent decisions and it sought in *Sanders* to resolve the inconsistency. It seems apparent, therefore, that the *Sanders* majority did not believe the compatibility of the search with the Fourth Amendment should turn on whether police suspicion related to the car (as in *Finnegan*) or to the container (as in *Stevie*). We cannot treat the *Finnegan-Stevie* citations in *Sanders* as idle or haphazard.[20] We must accept the clear implication of *Sanders*: *Stevie* was correctly decided; *Finnegan* incorrectly applied *Chambers* rather than *Chadwick*.

In *Sanders*, police suspicion related to the suitcase itself. In the case before us, the car trunk, not any identified container in it, was suspected of carrying contraband. But the Supreme Court's disapproval of *Finnegan* controls our analysis. Where a contain-

---

17. 442 U.S. at 754, 99 S.Ct. at 2588.

18. The car had been stopped for speeding. A patrol officer approached the car window and saw in plain view a large amount of currency and a gun case. The officer arrested the driver, removed the currency, opened the gun case, which contained a pistol and two fully-loaded clips, and further observed a suitcase in the hatchback. He then opened the suitcase and found incriminating evidence in it. 568 F.2d at 639.

19. The police, engaged in surveillance for narcotics trafficking, had observed two incoming

passengers at an airport, saw them load luggage into a rented station wagon, stopped the vehicle on the highway, arrested the occupants, looked for their luggage, and opened a suitcase found in the rear area of the station wagon. Inside were wrapped bricks of a substance later determined to be marijuana. 582 F.2d at 1176–77.

20. Nor does the Ninth Circuit, which now applies *Sanders* whether suspicion is focused on a particular piece of luggage or on the car in general. *United States v. Medina-Verdugo*, 637 F.2d 649, 652–53 (9th Cir. 1980).

er legitimately seized from a car trunk is searched without a warrant, *Sanders* precludes different outcomes when the container is suspected of housing contraband, and when the car itself is the object of suspicion.[21] We therefore conclude that, in this case, if a small suitcase had been removed from the trunk of Ross's car, and thereafter searched without obtaining a warrant, *Sanders* would mandate suppression of incriminating evidence found in the suitcase. The Government does not contest that conclusion, nor does it contest that it applies as well to the evidence seized in this case from the leather pouch. Supplemental Brief for Appellee at 7. Accordingly, the sole question we must determine is whether the Fourth Amendment protection cloaking an unlocked small suitcase and a zippered leather pouch stops short of a closed but unsealed paper bag.

### (B)

Before addressing whether *Sanders* envisions and the Fourth Amendment tolerates a warrant rule covering small suitcases and pouches but not paper bags, we set out facets of this case the parties do not seriously dispute. Based on the tip the police received,[22] Ross's car was properly stopped and searched, and the pouch and bag were properly seized. However, no "special exigencies"[23] justified opening the pouch or the bag without a warrant: both containers were securely removed from Ross's reach at the time of the seizure; the police entertained no belief that the containers or their contents endangered their personal safety; with the pouch and bag in police possession there was no risk that evidence would be lost or destroyed before a warrant could be obtained. *Cf. People v. Belton,* 50 N.Y.2d 447, 407 N.E.2d 420, 429 N.Y.S.2d 574 (1980) (warrantless search of jacket pockets may not be upheld as search incident to arrest once object is within the exclusive control of the police), *cert. granted,* 449 U.S. 1109, 101 S.Ct. 917, 66 L.Ed.2d 838 (1981).

Also beyond serious question is the coherent position the Supreme Court has elaborated with respect to the warrant requirement. The reasonableness of a search in light of the surrounding circumstances does not obviate the need for a warrant. *Sanders,* 442 U.S. at 758, 99 S.Ct. at 2590. On the contrary, the warrant requirement affords protection separate and distinct from the protection against unreasonable searches. *See generally* Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn.L.Rev. 349, 358–60, 374, 395 (1974). Whether or not the search would be "reasonable," the warrant requirement operates "as a matter of course." *Sanders,* 442 U.S. at 758, 99 S.Ct. at 2590 (quoting from *Coolidge v. New Hampshire,* 403 U.S. at 481, 91 S.Ct. at 2046):

> In the ordinary case ... a search of private property must be both reasonable and pursuant to a properly issued search

---

**21.** Even if *Sanders* did not itself compel such a result, we would question the administrative feasibility of a distinction based on whether the object of suspicion is the car or the container. In some cases, for example, when an informant has supplied a precise tip, the object of suspicion may be clearly defined. But in many cases, an officer derives probable cause from the totality of the circumstances, after observing a vehicle's movements and appearance, the demeanor and activities of its occupants, and the placement, transfer, or removal of containers to or from the vehicle. In such cases, it would demand too much to require the officer, after determining the existence of probable cause, to make the further assessment whether the car or the container is the "object of suspicion."

**22.** Ross argued before the three-judge panel that the police lacked probable cause to stop and search his car, but he has not pressed that objection before the full court. At any event, we believe it clear that the police had ample and reasonable cause to stop Ross and to search his car. The informer had supplied accurate information on prior occasions, and he was an eyewitness to sales of narcotics by Ross. He said he had just seen Ross take narcotics from the trunk of his car in making a sale and heard him say he possessed additional narcotics. *See Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *United States v. Davis,* 617 F.2d 677, 692–93 (D.C.Cir.1979).

**23.** *Sanders,* 442 U.S. at 763–64 n.11, 99 S.Ct. at 2593 n.11.

warrant. The mere reasonableness of a search, assessed in the light of the surrounding circumstances, is not a substitute for the judicial warrant required under the Fourth Amendment. . . .

"The warrant requirement has been a valued part of our constitutional law for decades, and it has determined the result in scores and scores of cases in courts all over this country. It is not an inconvenience to be somehow 'weighed' against the claims of police efficiency. It is, or should be, an important working part of our machinery of government, operating as a matter of course to check the 'well-intentioned but mistakenly overzealous executive officers' who are a part of any system of law enforcement."

*Sanders* reiterated that exceptions to the warrant requirement are few in number, jealously guarded, and carefully delineated. 442 U.S. at 759–60, 99 S.Ct. at 2590–91. We discern no established, well-drawn exception covering the opening of pouch or bag in this case. True, precedent fully supports stopping Ross's vehicle and seizing the pouch and bag. But the "automobile exception" [24] invoked to justify stopping the car and placing items found in it under police control cannot be stretched to encompass the warrantless openings.[25] The automobile exception rests on the inherent mobility of motor vehicles and the "severe," sometimes "impossible" burdens police departments would encounter were they required to place at every officer's beck and call "the people and equipment necessary to trans-

port impounded automobiles to some central location until warrants could be secured." *Sanders*, 442 U.S. at 761, 765–66 n.14, 99 S.Ct. at 2594–95 n.14. However, the pouch and bag with which we deal were immobilized by police seizure; it was hardly burdensome to carry them unopened to a magistrate. In short, with respect to inspecting the contents of pouch and bag, the police in this case were saddled with no burden other than the inconvenience obtaining a warrant imposes in any case.

Nor is it arguable that the search of pouch or bag was permissible as incident to an arrest. At no time after the car was stopped were the pouch and bag within Ross's immediate control. There was not the slightest danger that Ross or anyone other than the police would remove the contents of the containers before a warrant could be obtained. A delay in opening the pouch and bag pending appearance before a magistrate would not have jeopardized the safety of the police or the public. *See Sanders*, 442 U.S. at 763–64 n.11, 99 S.Ct. at 2593 n.11; *cf. Amsterdam, supra*, 58 Minn. L.Rev. at 412–14.[26]

Since no exception to the warrant requirement thus far delineated by the Supreme Court covers this case, the prosecution asks, in essence, that we delineate a new one. On the facts before us, it appears certain that the police could have obtained a warrant had they applied to a magistrate before opening the seized items. But surely an exception to the warrant requirement cannot rest on a post hoc judgment that a warrant would have been granted if one

---

**24.** *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed.2d 543 (1925); *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). *See generally* Moylan, *The Automobile Exception: What it is and What it is not—A Rationale in Search of a Clearer Label*, 27 Mercer L.Rev. 987 (1976); Note, *The Automobile Exception to the Warrant Requirement: Speeding Away from the Fourth Amendment*, 82 W.Va.L.Rev. 637, 637–56 (1980).

**25.** As *Sanders* indicated, 442 U.S. at 763, 99 S.Ct. at 2592, the exception has been applied by the Court to integral parts of an automobile but not to items separately contained and temporarily stored in a car. *See, e. g., South Dako-*

*ta v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (glove compartment); *Texas v. White*, 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975) (passenger compartment); *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) (trunk); *Chambers v. Maroney, supra* (concealed compartment under the dashboard); *Carroll v. United States, supra* (behind the upholstering of the seats).

**26.** The Government does not contend, nor could it plausibly, that the officers were engaged in an "inventory search." *Cf. South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976).

**1170**

had been requested. *See Sanders,* 442 U.S. at 764 n.12, 99 S.Ct. at 2593 n.12 (reasonableness of search, coupled with inconvenience of approaching a magistrate, does not justify dispensing with a warrant). Rather, the argument appears to be that some containers are fair game once they are seized because they are too small, too insecure, or too cheaply made to burden the time of a magistrate.

The fine distinctions into which the police and the courts would be drawn were we to adopt an "unworthy container" rule are apparent.[27] Size could not be the dividing line, nor does the Government contend otherwise given its concession that the leather pouch is encompassed by *Sanders.* A priceless bequest, great grandmother's diary, for example, could be carried in a sack far smaller than one accommodating jogging suit and sneakers. And if quality of material is what counts, on what side of the line would one place the variety of parcels people carry? Are police to distinguish cotton purse from silk; felt, vinyl, canvas, tinfoil, cardboard, or paper containers from leather; sacks closed by folding a flap from those closed with zippers, drawstrings, buttons, snaps, velcro fastenings, or strips of adhesive tape? Would a Tiffany shopping bag rank with one from the local supermarket?[28]

The point need not be labored further. Not only would an "unworthy container" rule fail to supply an "easily understood and administered" guide for the police,[29] it would suffer from infirmities more critical than administrative infeasibility. It would snare those without the means or the sophistication to use worthy containers.[30] And, most importantly, it would destroy the coherence of a well-established, clear, eminently manageable rule that, absent special necessity, a search must rest upon a search warrant.

*Sanders,* it seems to us, did not leave the matter in large doubt. The Court there indicated when the nature of the container would justify immediate search: "[S]ome containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance. Similarly, in some cases, the contents of a package will be open to 'plain view,' thereby obviating the need for a warrant." 442 U.S. at 765 n.13, 99 S.Ct. at 2593 n.13. Those guides, we think, are comprehensible, administrable, and consistent with the Supreme Court's stress on the centrality of the warrant requirement to Fourth Amendment enforcement.

Ordinarily, one cannot infer from the density, shape, or size of a leather pouch or opaque paper bag what is inside,[31] and this

---

**27.** *Cf.* Amsterdam, *supra,* 58 Minn.L.Rev. at 403 ("[I]n the first and most important instance the fourth amendment speaks to the police and must speak to them intelligibly.").

**28.** In addition to the value or sturdiness of a container and the way in which it is closed, the panel majority in this case suggested another variable: an unimposing container—a paper bag—might not be subject to warrantless opening if the police found it "amidst suitcases." Slip op. at 15–16 n.6. The paper bag in this case was found in the car trunk alongside a pouch that the Government now ranks as luggage. Would one luggage-like adjacent container suffice to upgrade the paper bag or would the bag remain vulnerable to on the spot warrantless search unless surrounded by several pieces of baggage?

**29.** *See United States v. Rivera,* 486 F.Supp. 1025, 1034 (N.D.Tex.1980).

**30.** *Cf.* The Washington Post, Dec. 15, 1980, at C1, col. 3 (reporting that Arlene Robinson and her six children, aged 4 to 12, homeless and on welfare, "have lived a hand-to-mouth existence, mostly on the streets of Washington, with their few belongings stuffed into paper shopping bags").

**31.** Neither police nor court, consistently with the Fourth Amendment, can reason backward to determine that no warrant was required if the container searched in fact concealed evidence of crime. Similarly, as to the reasonableness of a privacy expectation, the innocence or evil of the goods concealed cannot determine Fourth Amendment protection. *See United States v. Rivera, supra,* 486 F.Supp. at 1031–32, 1034. One has no greater or lesser expectation of privacy in a bag when it contains drugs prescribed by a physician for an embarrassing ailment than when it contains contraband. *Cf. United States v. Taborda,* 635 F.2d 131, 138–39 n.10 (2d Cir. 1980).

case presents no exception. The Government does not assert that the very appearance or feel of the paper bag seized from Ross's car trunk suggested its contents.[32] Nor does the Government argue that the contents of the bag were in "plain view" or that Ross willingly displayed what his sacks carried.[33] The means that Ross employed to store the contents of pouch and bag, it seems to us, were calculated to secure the privacy of his possessions against intrusion by members of the public.[34]

In summary, we cannot sanction the warrantless searches in this case without distorting the reasoning and diminishing the holding in *Sanders*. Nor can we distinguish between pouch and bag in a manner that makes theoretical or practical sense. We therefore conclude that "[w]here—as in the present case—the police, without endangering themselves or risking loss of the evidence," lawfully have stopped a car, detained any person in it suspected of criminal activity, and secured parcels found in the car, they must delay search of the parcels "until after judicial approval has been obtained. In this way, constitutional rights of suspects to prior judicial review of searches will be fully protected." *Sanders*, 442 U.S. at 766, 99 S.Ct. at 2594.

## IV.

Because Ross's conviction rested on evidence the police obtained through unlawful searches of the leather pouch and paper bag seized from his car trunk, the conviction is reversed and the case remanded for proceedings consistent with this opinion.

*Reversed and remanded.*

TAMM, Circuit Judge, dissenting in part:

The opinion for the court suggests that my learned colleagues of the majority are sensitive to theory but insensitive to reality. It is a basic responsibility of appellate courts stating the principles of constitutionally guaranteed rights to give, as precisely as possible, practical guidance both to trial courts and law enforcement officers. I feel that my colleagues of the majority, with particular reference to their ruling on the paper bag, are descending from disarray to chaos.

With this case we must decide whether law enforcement officers must obtain a search warrant before opening a closed paper bag or a closed leather pouch lawfully seized from the trunk of an automobile that the officers have probable cause to believe contains narcotics. I conclude that under the circumstances of this case, the defendant did not have a reasonable expectation of privacy in the contents of the paper bag once the bag was in police hands; the warrantless search of the paper bag, therefore, was permissible. A pouch, however, is a

---

**32.** *Cf. United States v. Sanders*, 631 F.2d 1309 (8th Cir. 1980) (contents of a 2½ by 3 inch brown manila packet could be inferred from its outward appearance where agents knew that such packets were frequently used to carry cocaine or heroin, the packet was well-worn, and part of it was torn off); *People v. Robbins*, 103 Cal.App.3d 34, 162 Cal.Rptr. 780 (1980) (holding 2–1 that contents of "green wrapped plastic blocks" could be inferred from outward appearance), *cert. granted*, 449 U.S. 1109, 101 S.Ct. 916, 66 L.Ed.2d 838 (1981).

**33.** Situated as they were in the locked car trunk, the pouch and bag surely were not "knowingly expose[d] to the public." *See Katz v. United States*, 389 U.S. 347, 351–52, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967); *cf.* Note, *Warrantless Searches and Seizures of Automobiles*, 87 Harv.L.Rev. 807, 840 n.29 (1974). Placement of the closed sacks inside the locked trunk sufficiently exhibited Ross's reasonable expectation that others would not peer or pry into his belongings. *Cf. United States v. Taborda, supra*, 635 F.2d at 136–39; *United States v. Rivera, supra*, 486 F.Supp. at 1031–34; Note, *Tracking Katz: Beepers, Privacy, and the Fourth Amendment*, 86 Yale L.J. 1461, 1472–77 (1977) (indicating that the concept "expectation of privacy" in Fourth Amendment cases is less than fully coherent, has produced confused and unprincipled decisions, and is in need of further Supreme Court attention and explication).

**34.** *See* Yale Note, *supra* note 33, at 1482. Judge Tamm's opinion dissenting in part, *post*, at 1177-1178, distinguishes paper bags from luggage partly on the basis that a paper bag, once out of its owner's possession, is more susceptible to invasions by the curious or the dishonest. In this regard, we see no significant difference between the vulnerability of an unlocked suitcase, pouch, or wallet and that of a folded paper bag.

form of luggage and the police must have a warrant to search such an item. Because the conviction of the defendant in this case rested on evidence obtained from both containers, I would reverse that conviction and remand for a new trial at which items taken from the paper bag, but not from the leather pouch, may be admitted.

## I

Ross's initial argument is that the police lacked probable cause to stop and search his car.[1] I disagree. Under *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), probable cause may be based on the information supplied by an informant if the informant was credible and he obtained his information in a reliable way. *See United States v. Davis*, 617 F.2d 677, 693 (D.C.Cir. 1979). One method of discovering an informant's credibility, that is, his truthfulness, is to examine his "track record" in providing police with accurate information. *Id. See Aguilar v. Texas*, 378 U.S. at 114 n.5, 84 S.Ct. at 1514. Here, undisputed testimony indicates the officers knew that this informant had supplied accurate information on prior occasions. Moreover, there is no challenge to the method in which the informant came upon his information: he was an eyewitness to actual sales of narcotics. Under these circumstances, I believe it clear that the police had probable cause to stop Ross and to search his car.

## II

Not only did the police have the necessary probable cause, but under *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), and *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), the officers lawfully could search Ross's automobile, including its trunk, without a warrant. *See United States v. Hawkins*, 595 F.2d 751, 753 (D.C.Cir.1978) (per curiam), *cert. denied*, 441 U.S. 910, 99 S.Ct.

2005, 60 L.Ed.2d 380 (1979). *But cf. United States v. Wilson*, 636 F.2d 1161 (8th Cir. 1980) (inventory search of locked automobile trunk held unreasonable). My only concern, then, is with the permissibility of the warrantless search of the containers they found in the trunk.

The fourth amendment dictates that "normally searches of private property [must] be performed pursuant to a search warrant issued in compliance with the Warrant Clause." *Arkansas v. Sanders*, 442 U.S. 753, 758, 99 S.Ct. 2586, 2590, 61 L.Ed.2d 235 (1979). A search warrant represents more than a formality or technicality. "The mere reasonableness of a search, assessed in light of the surrounding circumstances, is not a substitute for the judicial warrant required under the Fourth Amendment." *Id. See United States v. Chadwick*, 433 U.S. 1, 8, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977); *McDonald v. United States*, 335 U.S. 451, 455–56, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948). Moreover, the Supreme Court has stated clearly and emphatically that exceptions to the warrant requirement are rare, and that the few recognized exceptions must be "jealously and carefully drawn . . . ." *Jones v. United States*, 357 U.S. 493, 499, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958). *See also United States v. Jeffers*, 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59 (1951).

Analysis of fourth amendment protection begins with the person making claim to that protection. Fourth amendment rights are not intrinsic attributes of a container or any other object. Instead, "rights assured by the Fourth Amendment are personal rights . . . [that] may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure." *Simmons v. United States*, 390 U.S. 377, 389, 88 S.Ct. 967, 973, 19 L.Ed.2d 1247 (1968), *quoted in Rakas v. Illinois*, 439 U.S. 128, 138, 99 S.Ct. 421, 427, 58 L.Ed.2d 387 (1978). *Accord, Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct.

---

1. The majority opinion accurately sets out the relevant facts of this case. *See* majority op. at 1161 1162.

961, 966, 22 L.Ed.2d 176 (1969). The defendant must establish that "the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." *Rakas v. Illinois*, 439 U.S. 128, 140, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978). *See id.* at 130 n.1, 99 S.Ct. at 424 n.1.

To test whether the police officers' search of either the paper bag or the leather pouch invaded interests of Ross protected by the fourth amendment, I look to the expectation-of-privacy standard first enunciated in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), especially Justice Harlan's concurrence, *id.* at 360–62, 88 S.Ct. at 516–17. *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979); *Rakas v. Illinois*, 439 U.S. at 143, 99 S.Ct. at 430. An interest is protected if two elements are present. First, as a subjective aspect, the defendant actually must have expected the preservation of his privacy. *Katz v. United States*, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring). Thus if the accused intentionally displayed the contents of his automobile to the police, he obviously did not expect the contents to remain hidden from police view. *See id.* at 351, 88 S.Ct. at 511 (majority opinion). Second, as an objective aspect, the defendant's expectation must be one that society is prepared to recognize as reasonable. That is, the defendant must have relied justifiably on a freedom from governmental intrusion. *Id.* at 361, 88 S.Ct. at 516 (Harlan, J., concurring).

In most cases, the extent of expectation that is reasonable will depend upon the circumstances at the time of the search. The Supreme Court has taken several factors into account: the precautions taken to preserve privacy, the manner in which the person claiming fourth amendment protection has used the place or item searched, the treatment accorded that place or item at the time the Framers adopted the fourth amendment, and finally, the applicable property rights. *See Rakas v. Illinois*, 439 U.S. at 152–53, 99 S.Ct. 421, 435, 58 L.Ed.2d 387 (Powell, J., concurring) (summarizing earlier cases). For example, a lower expectation may be justified when the defendant no longer possesses the searched item. Both the majority and the dissent in *Rakas* acknowledged that "perhaps the Constitution provides some degree less protection for the personal freedom from unreasonable governmental intrusion when one does not have a possessory interest in the invaded private place." *Id.* at 166, 99 S.Ct. at 442 (White, J., dissenting), *quoted with approval in id.* at 146–47, 99 S.Ct. at 432 (majority opinion). Similarly, the Supreme Court has held in automobile cases that the characteristics of cars, the manner of their use, and the degree of their regulation dilute the justifiable expectation of privacy. *See Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). *Accord, Arkansas v. Sanders*, 442 U.S. 753, 761, 99 S.Ct. 2586, 2591, 61 L.Ed.2d 235 (1979).

In this case, however, we are not dealing with the search of a car but with the search of two containers. Our inquiry must focus on the reasonable expectation of privacy Ross had in the paper bag and the leather pouch. The contents of some containers, those the Supreme Court refers to as "common repositor[ies] for personal effects," are entitled to an expectation of privacy regardless of their location or the right to possess them. *Arkansas v. Sanders*, 442 U.S. 753, 763–66, 99 S.Ct. 2586, 2593–94, 61 L.Ed.2d 235 (1979). Luggage, such as a footlocker or a suitcase, "is *inevitably* associated with the expectation of privacy." *Id.* at 762, 99 S.Ct. at 2594 (emphasis added). Because society recognizes luggage as a personal sanctuary, its presence within a car or its having fallen lawfully into public hands does not alter the reasonableness of an expectation that it will not be opened by the police. *Id.; Rakas v. Illinois*, 439 U.S. 128, 154 n.2, 99 S.Ct. 421, 436 n.2, 58 L.Ed.2d 387 (1978) (Powell, J., concurring). Professor Wayne LaFave has observed that "[i]n *Chadwick*, the Court was able to say that the 'substantial infringement with respondents' use and possession' of the footlocker, justified by exigent circumstances,

'did not diminish respondents' legitimate expectation that the footlocker's contents would remain private.'" 2 W. LaFave, Search and Seizure § 5.5, at 365 (1978) (quoting *United States v. Chadwick*, 433 U.S. 1, 13 n.8, 97 S.Ct. 2476, 2485 n.8, 53 L.Ed.2d 538 (1977)). *Accord, id.* § 5.5 (Supp.1980) (analysis unaffected by *Sanders*). Cf. *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam) (Court examines the legality of ordering the driver of a stopped vehicle out of his car by looking to the incremental invasion of privacy, given the stop).

The same circumstances that justified the search of Ross's automobile also justify a warrantless seizure of the paper bag and leather pouch, thereby depriving Ross of some of his possessory rights, at least temporarily. Our focus shifts to whether Ross reasonably could expect that after the bag and pouch were seized by the police, these containers nevertheless would remain unopened. In differentiating fourth amendment treatment of containers, parcels, and packages from that of personal luggage, the *Sanders* Court stated that although the need for a warrant to search nonluggage does not depend "upon whether they are seized from an automobile,"[2] not all container types "deserve the full protection of the Fourth Amendment." *Arkansas v. Sanders*, 442 U.S. 753, 764 n.13, 99 S.Ct. 2586, 2593 n.13, 61 L.Ed.2d 235 (1979). The Court left us without detailed guidance concerning just what nonluggage containers require a warrant before being searched. We must therefore determine whether a paper bag or a leather pouch may be searched immediately after their proper seizure, or if, like luggage, they may only be impounded until the police officers can obtain a warrant to search them. *See id.* at 772, 99 S.Ct. at 2597 (Blackmun, J., dissenting).

### III

I believe that absent unusual circumstances not present here, the fourth amendment does not forbid the police from opening a paper bag once it is properly in their hands. After analyzing the privacy expectation in a paper bag lawfully seized by police, I conclude that the fourth amendment does not protect any privacy interest in a closed but unsealed paper bag over and above the privacy justified by virtue of possession and control.

In traveling to this conclusion, I am fortunate that a portion of my path has been illuminated by the federal and the state courts that have already dealt with related situations. In general, invalidation of warrantless searches has been confined to the types of containers normally associated with personal luggage: a suitcase, a briefcase, a purse, a duffle bag, a backpack, a gym bag, a vinyl satchel, or a guitar case.[3]

---

**2.** Consequently, the police may not capitalize on a container's momentary presence in a vehicle as a pretext for searching the container without a warrant. In *Chadwick*, the Court disallowed the opening of a footlocker that the police had not attempted to search, although they had probable cause to do so, until the defendant stowed the footlocker in the trunk of a car. In *Sanders*, the police had probable cause to search Sanders' suitcase before it was placed in the taxicab trunk, *see Arkansas v. Sanders*, 442 U.S. 753, 766, 99 S.Ct. 2586, 2594, 61 L.Ed.2d 235 (1979) (Burger, C. J., concurring in the judgment), but the police chose to wait. Nevertheless, although storing a container in a car does not suddenly strip the owner of his legitimate expectation of privacy in the container's contents, the presence of a container in an automobile may allow the police to discover and take possession of the container without a search warrant.

**3.** (1) *Suitcase: United States v. Montano*, 613 F.2d 147 (6th Cir. 1980) (per curiam); *United States v. MacKay*, 606 F.2d 264 (9th Cir. 1979); *State v. Crutchfield*, 123 Ariz. 570, 601 P.2d 333 (Ariz.App.1979); *Haughland v. State*, 374 So.2d 1026 (Fla.App.1979); *Buday v. State*, 150 Ga. App. 686, 258 S.E.2d 318 (1979); *State v. Gauldin*, 44 N.C.App. 19, 259 S.E.2d 779 (1979); *West Virginia v. Tomey*, 259 S.E.2d 16 (W.Va. 1979). Cf. *United States v. Kralik*, 611 F.2d 343 (10th Cir. 1979) (warrant to search car), *cert. denied*, 445 U.S. 953, 100 S.Ct. 1603, 63 L.Ed.2d 788 (1980); *State v. DeRusha*, 74 Ill. App.3d 641, 30 Ill.Dec. 583, 393 N.E.2d 619 (1979) (search permitted due to exigent circumstances); *People v. Plantefaber*, 91 Mich.App. 764, 283 N.W.2d 846 (1979) (exigent circumstances).

(2) *Briefcase: United States v. Presler*, 610 F.2d 1206 (4th Cir. 1979); *Moran v. Morris*, 478 F.Supp. 145 (C.D.Cal.1979) (dictum); *In re*

On the other hand, courts generally have found warrantless searches permissible when confronted with containers dissimilar to luggage: an integral part of an automobile, an open knapsack, a taped electric razor case, a toolbox, a closed but unsealed department store box, or a closed but unsealed envelope.[4]

*B.K.C.,* 413 A.2d 894 (D.C.1980); *Webb v. State,* 373 So.2d 400 (Fla.App.1979); *Araj v. State,* 592 S.W.2d 603 (Tex.Cr.App.1979). *Cf. United States v. White,* 607 F.2d 203 (7th Cir. 1979) (exigent circumstances); *United States v. Calaendrella,* 605 F.2d 236 (6th Cir.) (*Chadwick* not applied retroactively), *cert. denied,* 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979); *United States v. Garcia,* 605 F.2d 349 (7th Cir. 1979) (search incident to arrest), *cert. denied,* 446 U.S. 984, 100 S.Ct. 2966, 64 L.Ed.2d 841 (1980); *State v. Daniel,* 589 P.2d 408 (Alaska 1979) (inventory search, decision based on Alaska constitution).

(3) *Portfolio: United States v. Miller,* 608 F.2d 1089 (5th Cir. 1979), *cert. denied,* 447 U.S. 926, 100 S.Ct. 3020, 65 L.Ed.2d 1119 (1980).

(4) *Purse: Ulesky v. State,* 379 So.2d 121 (Fla.Dist.Ct.App.1979).

(5) *Wallet: Cf. State v. Hlady,* 43 Or.App. 921, 607 P.2d 733 (1979) (search permitted as being incident to arrest).

(6) *Duffle bag: United States v. Johnson,* 588 F.2d 147 (5th Cir. 1979).

(7) *Backpack: United States v. Meier,* 602 F.2d 253 (10th Cir. 1979).

(8) *Gym bag: State v. Marcum,* 24 Wash. App. 441, 601 P.2d 975 (1979). *Cf. State v. Hassapelis,* 404 A.2d 232 (Me.1979) (harmless error).

(9) *Tote bag: United States v. Benson,* 631 F.2d 1336 (8th Cir. 1980); *People v. Minjares,* 24 Cal.3d 410, 591 P.2d 514, 153 Cal.Rptr. 224, *cert. denied,* 444 U.S. 887, 100 S.Ct. 181, 62 L.Ed.2d 117 (1979).

(10) *Travel bag: People v. Little,* 598 P.2d 140 (Colo.1979) (en banc).

(11) *Guitar case: United States v. Bella,* 605 F.2d 160 (5th Cir. 1979) (per curiam).

(12) *Camera case: State v. DeLong,* 43 Or. App. 183, 602 P.2d 665 (1979) (decided under combination of *Sanders* and Oregon precedent).

*But see State v. Dalton,* 24 Cal.3d 850, 598 P.2d 467, 157 Cal.Rptr. 497 (1979) (closed metal box), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980).

Although in *United States v. Dien,* 609 F.2d 1038 (2d Cir. 1979), *adhered to on rehearing,* 615 F.2d 10 (2d Cir. 1980), the court held that a warrant was necessary to search three large cardboard boxes, the court predicated its conclusion on its findings that the use of plastic tape to seal the boxes and the secreting of the boxes behind covered windows "manifested an expectation that the contents would remain free from public examination." *Id.* at 1045. *Accord, United States v. Rivera,* 486 F.Supp. 1025 (N.D.Tex.1980) (sealed polyethylene bags); *State v. White,* 615 P.2d 1004 (N.M.App. 1980) (closed, partially sealed boxes and bags);

*People v. Spencer,* 74 A.D.2d 77, 426 N.Y.S.2d 605 (App.Div.1980) (sealed cardboard carton). *See United States v. Mannino,* 487 F.Supp. 508 (S.D.N.Y.) (no reasonable expectation of privacy in unsealed cardboard boxes), *aff'd,* 635 F.2d 110 (2d Cir. 1980). *But see People v. Robbins,* 103 Cal.App.3d 34, 162 Cal.Rptr. 780 (no reasonable expectation of privacy in taped, plastic-wrapped package), *cert. granted,* 449 U.S. 1109, 101 S.Ct. 916, 66 L.Ed.2d 838 (1981).

**4.** (1) *Integral part of the automobile: United States v. Dall,* 608 F.2d 910 (1st Cir. 1979) (camper cap), *cert. denied,* 445 U.S. 918, 100 S.Ct. 1280, 63 L.Ed.2d 603 (1980); *cf. United States v. Ramapuram,* 632 F.2d 1149 (4th Cir. 1980) (junked car).

(2) *Unlatched knapsack: State v. Schrier,* 283 N.W.2d 338 (Iowa 1979).

(3) *Closed satchel: United States v. Milhollan,* 599 F.2d 518 (3d Cir.), *cert. denied,* 444 U.S. 909, 100 S.Ct. 221, 62 L.Ed.2d 144 (1979) (three Justices would have granted the writ and reversed under *Sanders*).

(4) *Taped electric razor case: Cooper v. Commonwealth,* 577 S.W.2d 34 (Ky.App.1979).

(5) *Closed but unlocked toolbox: Wyss v. State,* 262 Ark. 502, 558 S.W.2d 141 (1977).

(6) *Closed but unsealed department store box: United States v. Neumann,* 585 F.2d 355 (8th Cir. 1978) (inventory search permitted because boxes cannot be closed securely).

(7) *Cigar box: In the Matter of Isaiah Horne,* 50 N.C.App. 97, 272 S.E.2d 905 (1980).

(8) *Envelopes: United States v. Sanders,* 631 F.2d 1309 (8th Cir. 1980); *United States v. Duckett,* 583 F.2d 1309 (5th Cir. 1978).

(9) *Burlap bag: State v. Casillas,* 393 So.2d 694 (La.1981); *Burkett v. State,* 607 S.W.2d 399 (Ark.1980) (dictum).

(10) *Plastic bags: United States v. Mannino,* 635 F.2d 110 (2d Cir. 1980) (plastic and paper bags); *United States v. Gooch,* 603 F.2d 122 (10th Cir. 1979); *United States v. Ficklin,* 570 F.2d 352 (9th Cir. 1978) (memorandum) (plastic and burlap bags), *cert. denied,* 439 U.S. 825, 99 S.Ct. 95, 58 L.Ed.2d 118 (1978), *quoted in United States v. Stevie,* 582 F.2d 1175, 1179 n.4 (8th Cir. 1978), *cert. denied,* 443 U.S. 911, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979); *State v. Duers,* 49 N.C.App. 282, 271 S.E.2d 81 (1980); *State v. Januszewski,* —— Conn. ——, 42 C.L.J. 8 (Conn. Aug. 19, 1980) (garbage bag in automobile); *Flynn v. State,* 374 So.2d 1041 (Fla.App.1979). *But see Liichow v. State,* 419 A.2d 1041 (Md.1980) (manner and circumstances of defendant's possession of personal belongings in plastic bag demonstrated a reasonable expectation of privacy).

**1176**

Several courts have looked at paper bags in particular, and have concluded a search is permissible after their seizure. In *United States v. Mackey*, 626 F.2d 684 (9th Cir. 1980), police discovered a paper bag beneath the front seat of an automobile on the passenger's side. Finding no reason to distinguish between the clearly justified seizure of the bag and the search of its contents, the court held that the defendant did not possess a sufficient privacy interest in the paper bag to justify imposing the warrant requirement of *Chadwick* and *Sanders*. In *United States v. Goshorn*, 628 F.2d 697 (1st Cir. 1980), police discovered two plastic bags inside three brown paper bags which were further inside two other plastic bags, all within the *locked trunk of an automobile*. The court held that the facts of record failed to establish that the defendant possessed a reasonable expectation of privacy in the bags found within the automobile trunk. The Second Circuit held that a warrantless search of a folded-over brown paper bag inside a folded-shut plastic bag located on the front seat of an automobile would not violate the fourth amendment. *United States v. Mannino*, 635 F.2d 110 (2d Cir. 1980). Furthermore, the Seventh Circuit held that a defendant had no reasonable expectation of privacy in a brown paper bag located within a locked automobile trunk. *United States v. Jimenez*, 626 F.2d 39 (7th Cir. 1980). In *United States v. Brown*, 635 F.2d 1207 (6th Cir. 1980), the Sixth Circuit upheld the warrantless search of a closed paper bag found in an automobile trunk. In yet a sixth ruling by a federal appellate court on this point, the Fifth Circuit upheld the warrantless search of a paper sack located on the front floorboard of an automobile. *United States v. Sutton*, 636 F.2d 96 (5th Cir. 1981).

In *United States v. Andrews*, No. 79 Cr. 374 (MJL) (S.D.N.Y. Nov. 2, 1979), an undercover agent had seen a brown paper bag and a vial of clear liquid, taken from the bag, which had been identified as the "juice." Later, after surveillance, police arrested the driver of a car. While searching the car's trunk, the arresting officer observed a brown paper bag. Searching the paper bag, the officer found the vial previously shown to the undercover agent. Although citing *Arkansas v. Sanders*, the court denied a motion to suppress without discussing the warrantless search of the bag. In *Clark v. State*, 574 P.2d 1261 (Alaska 1978), a search of defendant's rental car uncovered a paper bag in the glove compartment. Still without a warrant, the police officer opened the bag and discovered it contained narcotics. Affirming Clark's conviction, the Alaska Supreme Court compared this case with *Chadwick* and concluded that the expectation of privacy was much lower in a paper bag's contents than in a footlocker's. Reaching the same conclusion, the court in *Webb v. State*, 373 So.2d 400 (Fla.App.1979), noted that there are

arguable differences between the reasonable expectation of privacy one might attach to a paper bag as opposed to a briefcase or luggage of some type. Whereas "luggage is a common repository for one's personal effects, and therefore is inevitably associated with the expectation of privacy," *Arkansas v. Sanders*, supra, the same does not hold true to paper bags.

*Id.* at 403. Courts have also found the contents of opaque plastic bags, containers comparable to paper bags, to be entitled to

(11) *Paper bags: United States v. Sutton*, 636 F.2d 96 (5th Cir. 1981); *United States v. Brown*, 635 F.2d 1207 (6th Cir. 1980); *United States v. Honigman*, 633 F.2d 1336 (9th Cir. 1980) (paper bag inside grocery bag); *United States v. Mackey*, 626 F.2d 684 (9th Cir. 1980); *United States v. Jimenez*, 626 F.2d 39 (7th Cir. 1980); *United States v. Goshorn*, 628 F.2d 697 (1st Cir. 1980); *United States v. Vento*, 533 F.2d 838 (3d Cir. 1976); *United States v. Andrews*, No. 79 Cr. 374 (MJL) (S.D.N.Y. Nov. 2,

1979) (approved without discussion although *Sanders* cited elsewhere in opinion); *People v. Fick*, 107 Cal.App.3d 892, 166 Cal.Rptr. 106 (1980); *State v. Cavegn*, 294 N.W.2d 717 (Minn.1980); *Clark v. State*, 574 P.2d 1261 (Alaska 1978); *Webb v. State*, 373 So.2d 400 (Fla.App.1979) (dictum). *See United States v. Portillo*, 633 F.2d 1313 (9th Cir. 1980) (touch of paper bag located in automobile trunk revealed presence of handgun).

a lesser expectation of privacy than personal luggage. *See, e. g., United States v. Mannino*, 635 F.2d 110 (2d Cir. 1980); *United States v. Ficklin*, 570 F.2d 352 (9th Cir. 1978) (memorandum), *cert. denied*, 439 U.S. 825, 99 S.Ct. 95, 58 L.Ed.2d 118 (1978), *quoted in United States v. Stevie*, 582 F.2d 1175, 1179 n.4 (8th Cir. 1978), *cert. denied*, 443 U.S. 911, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979); *State v. Duers*, 49 N.C.App. 282, 271 S.E.2d 118 (1980); *Flynn v. State*, 374 So.2d 1041 (Fla.App.1979) (contrasting *Sanders*).

Recitation of precedent does not by itself determine whether Ross continued to have a reasonable expectation of privacy after his paper bag was lawfully seized by police. I must also rely on my own analysis of when a legitimate expectation of privacy attaches to a given container, so that absent exigent circumstances, a search requires a warrant. As the Supreme Court declared in *Rakas v. Illinois*, "it would, of course, be merely tautological to fall back on the notion that those expectations of privacy which are legitimate depend primarily on cases deciding exclusionary rule issues in criminal cases." 439 U.S. at 143 n.12, 99 S.Ct. at 430 n.12. Instead, "[l]egitimation of expectation of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Id. See Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) (society not prepared to recognize expectation of privacy in identity of telephone numbers called from another telephone). I therefore must decide what "sense of security" should exist in society, and I must do so at least in part by looking at "the customs and values of the past and present...." *United States v. White*, 401 U.S. 745, 786, 91 S.Ct. 1122, 1143, 28 L.Ed.2d 453 (1971) (Harlan, J., dissenting), *quoted in* 1 W. La-Fave, Search and Seizure § 2.1, at 231 (1978). Other important considerations include the precautions taken to preserve privacy, the manner in which the paper bag was used, and the property rights in the bag at the time of the search. *See* pages 4–5 *supra. See also* Note, *From Private Places to Personal Privacy: A Post-Katz Study of Fourth Amendment Protection*, 43 N.Y.U.L.Rev. 968, 983–84 (1968) ("The degree of privacy offered by structural characteristics, such as partitions or walls, is an important determinant of an area's character.").

If a paper bag were a form of luggage, my task would be a simple one: *Sanders* requires a warrant before searching any piece of luggage. Paper bags differ from personal luggage in two material respects, however. First, paper bags offer at best only minimal protection against accidental and deliberate intrusions. A paper bag can fall open or break very easily. It presents no real obstacles to invasions by the curious or the dishonest once it has left its owner's actual possession. Because it is neither so secure nor so permanent as typical forms of luggage, its contents are much more likely to become subject to public display than if the same items had been stored in luggage. Thus, it is doubtful that one realistically can expect a paper bag to remain closed or intact, its contents unrevealed, at least if it has left its owner's hands. *See United States v. Mackey*, 626 F.2d 684, 687 (9th Cir. 1980). *Cf. United States v. Neumann*, 585 F.2d 355 (8th Cir. 1978) (cardboard boxes not secure; inventory search justified).

Second, paper bags are not *inevitably* associated with the expectation of privacy. *See Arkansas v. Sanders*, 442 U.S. 752, 762, 99 S.Ct. 2586, 2592, 61 L.Ed.2d 235 (1979). Although a paper bag *may* be pressed into service as a repository of personal effects, I do not believe a reasonable man would identify a paper bag as a normal place to entrust his intimate personal possessions. In contrast, luggage in general serves to carry clothes, toiletries, and other items associated with day-to-day living. Luggage typically functions as a portable closet and chest of drawers; it follows that a person could justifiably maintain a substantially

higher expectation of privacy in his personal luggage than in a paper bag.[5]

We therefore must decide whether, under the circumstances of this case, Ross had a reasonable expectation of privacy in the paper bag that the police discovered during the lawful search of the trunk of his car. The officers had reason to believe that the trunk was the warehouse for Ross's narcotics sales. Thus it was serving as more than simply a luggage compartment. When the police in searching the trunk came upon a paper bag, there was no indication that it was being used to carry intimate, private items. *See United States v. Dien*, 609 F.2d 1038 (2d Cir. 1979), *adhered to on rehearing*, 615 F.2d 10 (2d Cir. 1980). *See generally United States ex rel. Cunningham v. Follette*, 397 F.2d 143, 145 (2d Cir. 1968), *cert. denied*, 393 U.S. 1058, 89 S.Ct. 699, 21 L.Ed.2d 699 (1969); *Walker v. United States*, 327 F.2d 597, 600 (D.C.Cir.1963), *cert. denied*, 377 U.S. 956, 84 S.Ct. 1635, 12 L.Ed.2d 500 (1964); *Liichow v. State*, 288 Md. 502, 419 A.2d 1041 (Md.1980).[6] No one disputes that the police had the right to seize the bag to prevent the destruction of its contents, that is, the destruction of pos-

sible evidence. *See Arkansas v. Sanders*, 442 U.S. at 762, 99 S.Ct. 2586, 61 L.Ed.2d 235; *United States v. Chadwick*, 433 U.S. 1, 13, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1978). Because a paper bag's general vulnerability suggests no reasonable expectation of privacy after its seizure, *see* page 1177 *supra*, and because the police justifiably believed that *this* paper bag was not being used to store personal items, the police lawfully could open it without violating Ross's fourth amendment rights.

In the final analysis, my determination of what "sense of security" should exist in society must be based upon general experience and judgment. The facts in this case lead me to conclude that Ross could not reasonably harbor an expectation of privacy in his paper bag beyond that existing due to actual possession, which is all that enables one to protect a paper bag's contents from public exposure. If, as the *Sanders* decision suggests, there are containers that the police, *after a proper seizure*,[7] may open without a search warrant, Ross's bag must be among the best examples. Thus I agree with Professor LaFave that compared to the warrantless search of luggage, "when

---

5. I would not create a rule that only luggage is protected by the fourth amendment. Because society always associates luggage with privacy, the fourth amendment must always protect it. This is not an intrinsic characteristic of the luggage but a legal application of society's manifested expectations—an extrinsic quality, so to speak. Because a paper bag is not a piece of luggage, however, I must undertake the more general inquiry of whether under the facts before us this particular container suggests an expectation of privacy. After examining those facts, I have concluded that Ross's paper bag did not connote such an expectation of privacy. Therefore, there was no privacy interest for the fourth amendment to protect.

6. There was no evidence that Ross employed the paper bag as a substitute for luggage, nor do the facts and circumstances manifest any special expectation of privacy. If, for example, the police had found the paper bag amidst suitcases or other luggage, there would have been a stronger indication that the bag was pressed into service as a repository of personal effects. Similarly, if Ross had sealed the paper bag shut, manifesting a special expectation of privacy, the intrusion of a search would have been more than negligible and a search warrant might well have been required. In any situa-

tion approaching a borderline case, the police would best be cautious, and obtain a proper search warrant before proceeding.

I read the Supreme Court's decisions interpreting the fourth amendment to state that objective evidence of an expectation of privacy is one factor to be considered in determining whether an asserted privacy interest should be protected. This note attempts to give law enforcement officials some guidance as to the treatment of certain objective evidence with which they are likely to be confronted. The majority opinion appears more interested in mocking the problems resulting from this necessary "line-drawing process," *Arkansas v. Sanders*, 442 U.S. at 757, 99 S.Ct. 2586, 61 L.Ed.2d 235, than in offering any instruction or guidance.

7. The majority opinion's irrelevant reference to those who carry their belongings in shopping bags, majority op. at 1184–1185 n.30, misapprehends this basic analytical point. Only after a valid *seizure* of the container, pursuant to a warrant or within a well-delineated exception to the warrant requirement, must the legality of a search be addressed.

the [searched] effects are such things as coats and paper bags, the possessory interest and privacy interest are much less distinct, and it is thus far easier to conclude that the [privacy] interest is not protected by the Warrant Clause whenever exigent circumstances allow a warrantless intrusion upon the [possessory] interest." 2 W. La-Fave, Search and Seizure § 5.5, at 365 (1978). *Accord, id.* § 5.5 (Supp.1980) (analysis unaffected by *Sanders*).

## IV

With respect to Ross's red leather pouch, *Sanders* controls directly. *See* pages 1173, 1177 *supra*. As a type of personal luggage, the pouch, in the words of *Sanders* itself, is a "common repository for one's personal effects, and therefore is inevitably associated with the expectation of privacy." *Arkansas v. Sanders*, 442 U.S. 753, 762, 99 S.Ct. 2586, 2592, 61 L.Ed.2d 235 (1979). Absent a valid warrant or one of the few recognized exceptions, any evidence secured from the leather pouch should be excluded when determining Ross's criminal culpability.

The Government attempts to bring the warrantless search of the leather pouch within the exception for searches incident to a lawful arrest. The attempt fails. Ross does not challenge a police search of his person or of any object associated with his person at the time of his arrest. *See United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). When Detective Cassidy seized the pouch and later opened it at police headquarters, it was far from Ross's reach and in the exclusive control of the police. There was no danger Ross might gain access to the pouch and retrieve a weapon or destroy evidence. The police officers had no reason to believe that the pouch contained explosives or any other item that might prove hazardous to themselves or to the public. Ross's arrest cannot excuse a search made a substantial time

later and a substantial distance away. *Preston v. United States*, 376 U.S. 364, 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1964). *See generally United States v. Chadwick*, 433 U.S. 1, 15, 97 S.Ct. 2476, 2485, 53 L.Ed.2d 538 (1977); *Chimel v. California*, 395 U.S. 752, 763–64, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969).

I agree with the majority that none of the "specifically established and well-delineated exceptions," *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967), to the warrant requirement applied and that the police failed to follow " 'the procedure of antecedent justification before a magistrate that is central to the Fourth Amendment ....' " *Osborn v. United States*, 385 U.S. 323, 330, 87 S.Ct. 429, 433, 17 L.Ed.2d 394 (1966) (quoting *Ohio ex rel. Eaton v. Price*, 364 U.S. 263, 272, 80 S.Ct. 1463, 1468, 4 L.Ed.2d 1708 (1960) (opinion of Brennan, J.) (equally divided Court)). The currency found in the red leather pouch should have been suppressed as evidence.[8]

## V

Although it is certainly noteworthy that every court confronted with the warrantless search of a paper bag, save for this court today, has upheld the search, *see* pages 1176 and note 4 *supra*, my analysis of searches based on the container involved should not be construed as offering any *per se* rules. Rather, as this court recently stated, each encounter between law enforcement officers and citizens "is unique, involving the weighing and measuring of contrary indicators." *United States v. White*, 648 F.2d 29, at 34 (D.C.Cir.1981). We must continue to examine the totality of the circumstances in each case. As I interpret current Supreme Court precedent, our duty is to search for objective indicia signalling an expectation of privacy that society is prepared to accept as reasonable.

---

8. The Government's counsel conceded at oral argument that the $3,200 in currency found in the pouch was essential to the Government's charge of narcotics possession with intent to distribute, the only crime Ross was convicted of having committed. We are thus unable to excuse introduction of the evidence as harmless error. *See, e. g., United States v. James*, 473 F.2d 115 (D.C.Cir.1972).

*United States v. Markland,* 635 F.2d 174 (2d Cir. 1980); *United States v. Mannino,* 635 F.2d 110 (2d Cir. 1980).

Because Ross's conviction rested in part on evidence that the police obtained through an unlawful search, I would reverse the conviction and remand the case for further proceedings not inconsistent with this opinion.

MacKINNON, Circuit Judge (dissenting).

I concur with Judge Tamm's opinion to the extent that it holds the examination of the inside of the paper bag was legal. I also concur in Judge Wilkey's opinion to the extent that it holds that *Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979) should *not* be applied retroactively.

I have examined the leather pouch. It is a small money pouch, 7″ × 8″ square, 2″ wide at the bottom, made of soft, red leather with a zipper along the top. I would not place the paper bag or the small pouch in the category of "personal luggage". *Cf.,* 442 U.S. at 765, 99 S.Ct. at 2594. In my opinion the luggage cases are not applicable. In fact, with respect to the paper bag, a prominent strip cartoonist, Reggie Smythe, had his character, Andy Capp, make a joke of such claim—Andy Capp: "Where's your mother off to?" Flo: "She's stayin' with Auntie Ada for a few days." Andy: "There she goes now, down to the bus station with 'er matchin' luggage." Flo: "Matchin' luggage?" Andy: "Yeah, two carrier bags from the supermarket." [1] The factual situation here is a far cry from the locked footlocker in *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

The seizure of the bag and pouch was supported by probable cause and was reasonably related to the justification for the stop which was very strong probable cause. *Cf., United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1980); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

[1]. *Washington Post,* June 21, 1980.

Despite what some decisions state, I have great difficulty in agreeing that subsequently looking into the bag and the pouch from the top should be determined to be "unreasonable"—which *is* the constitutional standard. Amend. IV, U.S.Const. Having *properly* seized the paper bag and the small pouch the police would have acted unreasonably in my opinion if they had *not* merely looked inside.

ROBB, Circuit Judge, dissenting:

I concur in Judge Tamm's dissent with regard to the paper bag. As for the leather pouch I concur only because I think the result Judge Tamm reaches is compelled by recent decisions of the Supreme Court. With great respect however I must add that to me this result does not make sense. It follows from a rule which creates search-resistant cells or compartments in an area otherwise lawfully subject to search. In my opinion the right to search an automobile should include the right to open any container found within the automobile, just as the right to search a lawfully arrested prisoner carries with it the right to examine the contents of his wallet and any envelope found in his pocket, and the right to search a room includes authority to open and search all the drawers and containers found within the room. It is reasonable to extend a lawful search to the wallet and envelope, and to drawers and containers in a room, and I think it equally reasonable to extend a lawful automobile search to containers in the automobile.

Again with respect I find the "expectation of privacy" test impractical. It conditions an officer's right to search upon the subjective feeling of the man challenging the search—or at least upon such feeling as a judge thinks he might reasonably entertain. This amorphous standard causes and will continue to cause doubt and confusion among law-enforcement officers and courts.

WILKEY, Circuit Judge, dissenting:

In her careful and well-reasoned opinion for the majority, Judge Ginsburg convinc-

ingly analyzes the current state of the Supreme Court precedent controlling our decision today. I concur with the majority in its conclusion that the Court's ruling in *Arkansas v. Sanders*[1] compels us, a lower court, to hold that a warrant is now required before a police officer may open an opaque container whose shape does not disclose its probable contents, even if the container has been found during a lawful warrantless search of an automobile.

But no matter how correct this holding seems to be, pending further clarification by the Supreme Court, we should not be making this decision today.[2] This case should have been decided without a major constitutional pronouncement from this court. To prevent unnecessary constitutional decisionmaking, the Supreme Court has directed the lower courts to decide potentially dispositive issues concerning the retroactive application of the exclusionary remedy before passing on to substantive questions of constitutional law.[3] But the majority today dismisses—in my view incorrectly—the government's position that the benefits of the *Sanders* rule are not retroactively available to Ross.[4]

The majority has stumbled over the retroactivity hurdle. Under the standard enunciated by the Supreme Court in *United States v. Peltier*[5] and binding on us, "evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or

may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."[6] It is no secret that at the time Detective Cassidy opened Ross's bag and pouch the nation's leading lower courts and commentators were admitting puzzlement regarding how the Supreme Court would ultimately resolve the issue finally addressed by it in *Sanders.*[7] So we would have to impute to Detective Cassidy nearly supernatural powers to see the future before we could charge him with knowledge that his conduct was unconstitutional. The windfall benefit of the exclusionary remedy thus should not be extended to Ross and the evidence uncovered by Cassidy should not be the subject of *ex post facto* suppression.

In Part I of the opinion that follows I show why the majority plainly errs in gratuitously conferring on Ross the advantages of *Sanders.* Then, having been forced to address the merits by the majority's determination that *Sanders* applies retroactively, I set forth in Part II why I believe a judge sitting on a lower court must agree with the majority's conclusion that *Sanders* applies to paper bags. Finally, in Part III I take the opportunity this case presents to underscore once again the devastating impact the exclusionary remedy has had on the administration of the criminal justice system. The elimination of this ill-conceived anachronism is now long overdue.

1. 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979).

2. Further enlightenment may be swift in coming. Since we heard oral argument in this case, the Supreme Court has granted *certiorari* in two search and seizure cases involving containers. *People v. Robbins,* 162 Cal.Rptr. 780, 103 Cal.App.3d 34 (Ct.App.1980), *cert. granted,* 449 U.S. 1109, 101 S.Ct. 916, 66 L.Ed.2d 838 (1981); *People v. Belton,* 50 N.Y.2d 447, 429 N.Y.S.2d 574, 407 N.E.2d 420 (1980), *cert. granted,* 449 U.S. 1109, 101 S.Ct. 917, 66 L.Ed.2d 838 (1981). The fact that Supreme Court action in these two cases is now pending underscores the extent to which our unnecessary pronouncements today are ill-advised.

3. "[T]he district courts and courts of appeals should follow our practice, when issues of both retroactivity and application of constitutional

doctrine are raised, of deciding the retroactivity issue first." *Bowen v. United States,* 422 U.S. 916, 920, 95 S.Ct. 2569, 2572, 45 L.Ed.2d 641 (1975).

4. Majority opinion (Maj. op.) at 1162–1164.

5. 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975).

6. *Id.* at 542, 95 S.Ct. at 2320.

7. For example, Prof. LaFave wrote at about the time of the events with which we are concerned here: "It is impossible to predict how the court would decide [a case like *Sanders* ]." 2 W. LaFave, Search and Seizure § 7.2, at 538–39 (1978). See the discussion in Part I below.

## I. THE RETROACTIVE REACH OF *SANDERS*

While for the reasons set out in Part II of this opinion I agree with the majority that *Sanders* established that a suspect has a constitutional right to have the police obtain a warrant before they open a container found during a search of a car, I do not agree that the appellant before us is entitled to the benefits of the exclusionary *remedy* for violations of the *Sanders* rule that occurred *before Sanders* was decided. The exclusionary remedy is not a personal right to which Ross can lay claim;[8] it is merely a judicial attempt to remove whatever incentive there might otherwise be to police misconduct.[9] Because *Sanders* had not yet been decided on the evening when Detective Cassidy opened Ross's brown paper bag and red leather pouch,[10] Cassidy could not possible have "had knowledge, or . . . properly be[en] charged with knowledge"[11] that opening containers found in a car without a warrant would later be held to violate the Constitution. A police official cannot be deterred from doing something he could not have known was unlawful. Under the controlling Supreme Court precedent,[12] I accordingly would hold that the evidence Cassidy obtained was properly admitted at Ross's trial.

### A. The Significance of Retroactivity

In *Sanders* the Supreme Court expanded the scope of the right to a warrant under the Fourth Amendment to cover containers found during a lawful search of the integral parts of an automobile. In the case before

---

8. *Stone v. Powell*, 428 U.S. 465, 486, 96 S.Ct. 3037, 3048, 49 L.Ed.2d 874 (1976) ("Post-*Mapp* decisions have established that the rule is not a personal constitutional right. It is not calculated to redress the injury to the privacy of the victim of the search or seizure, for any '[r]eparation comes too late.') (citation omitted); *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974) (footnote omitted) ("the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved"); *Elkins v. United States*, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960) ("The rule is calculated to prevent, not to repair. Its purpose is to deter— to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.").

While the Court has often reiterated that the exclusionary remedy is not a right to which a defendant is entitled, it has also held that the exclusionary remedy is not available to a defendant whose own Fourth Amendment rights have not been violated. *See, e. g., United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 2548, 65 L.Ed.2d 619 (1980) ("defendants charged with crimes of possession may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have in fact been violated"); *Rakas v. Illinois*, 439 U.S. 128, 134, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978) ("it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the [exclusionary] rule's protections"); *Brown v. United States*, 411 U.S. 223, 230, 93 S.Ct. 1565, 1569, 36 L.Ed.2d 208 (1973); *Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 966, 22 L.Ed.2d 176 (1969). Moreover, courts will not exclude unconstitutionally seized evidence without an objection by the defendant or over his assent. Even when a search is "flagrantly illegal," *United States v. Payner*, 447 U.S. 727, 729, 100 S.Ct. 2439, 2443, 65 L.Ed.2d 468 (1980), and "possibly criminal," *id.* at 733, 101 S.Ct. at 2445, the Court has ruled the evidence obtained cannot be excluded if the defendant lacks standing. *Id.*

9. *Stone v. Powell*, 428 U.S. 465, 486, 96 S.Ct. 3037, 3048, 49 L.Ed.2d 874 (1976) ("The primary justification for the exclusionary rule then is the deterrence of police conduct that violates Fourth Amendment rights."); *Elkins v. United States*, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960).

10. The chronology of events is important to what follows: (1) on 21 June 1977 the Supreme Court decided the case of *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); (2) on 27 November 1978 the appellant, Albert Ross, was arrested and his brown paper bag and red leather pouch searched, Brief for Appellee at 2; (3) on 9 February 1979 the district court held a pretrial hearing on Ross's motion to suppress the evidence obtained from the search of his possessions, *id.* at 1; (4) on 21 March 1979, after a three-day trial, Ross was convicted, *id.* at 1–2; (5) on 20 June 1979 the Supreme Court decided *Arkansas v. Sanders*, 422 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979).

11. *United States v. Peltier*, 422 U.S. 531, 542, 95 S.Ct. 2313, 2320, 45 L.Ed.2d 374 (1975).

12. *United States v. Peltier*, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975).

us, a majority of this court has felt it necessary to reach the question whether Ross's brown paper bag is a container of a type subject to the *Sanders* mandate, and to hold that it is.[13] But before Ross himself can benefit from *Sanders* two other questions must be answered in his favor: it must be decided, first, that the right announced in *Sanders* applies retroactively to pre-*Sanders* searches, and if so, that the exclusionary *remedy* for violations of that right are also available retroactively.

Admittedly, the answers we give to these questions in the long run will be of lesser significance than the holding to which the court today directs most of its energy—that *Sanders* applies to paper bags.[14] It hardly needs to be said that the conclusion that *Sanders* applies retroactively will be dispositive of only the relatively few cases arising from events occurring during a limited stretch of time.

Nevertheless, were we to find that the exclusionary remedy for violations of the *Sanders* rule is *not* available retroactively, the outcome of Ross's case could be determined without reaching the broader constitutional question the majority today addresses, and on which I therefore have felt obliged to write. To prevent just this sort of unnecessary constitutional decisionmaking, the Supreme Court has explicitly directed us to follow the practice of deciding retroactivity issues first whenever possible.[15] Were this court to do otherwise, it would not only disobey the mandate of the Supreme Court, but demonstrate that it misunderstands the proper constitutional role of the federal courts.[16]

The majority, of course, did address the retroactivity question first,[17] but, its determination that *Sanders* applies retroactivity is plainly in error. Unfortunately, this error is compounded in that it provides the excuse necessary to permit the majority to reach a constitutional issue we could have left for another day.

B. *The Controlling Precedent: United States v. Peltier*

As the majority opinion admits, the Supreme Court held in *United States v. Peltier*[18] that "decisions expanding the scope of the exclusionary rule should have prospective effect only."[19] The *Peltier* opinion is the key to determining whether the exclusionary remedy should be applied retroactively to searches in violation of *Sanders*. It is thus worth recalling in some detail what the *Peltier* court decided.

*Peltier* announced useful guidelines for the retroactive application of the exclusionary rule remedy, but in doing so it did not create new doctrine. It merely codified what had previously been decided piecemeal. For prior to *Peltier*, as the Court noted:

> [I]n every case in which the Court ha[d] addressed the retroactivity problem in the context of the exclusionary rule, whereby concededly relevant evidence is excluded in order to enforce a constitutional guarantee that does not relate to the integrity of the factfinding process, the Court ... concluded that any such new constitutional principle would be accorded only prospective application.[20]

In *Peltier* the Court did little more than set forth in a single opinion the basis for this unbroken string of decisions.[21]

---

**13.** Maj. op. at 1171.

**14.** *Id.*

**15.** *See* note 3 *supra.*

**16.** *See, e. g., Ashwander v. TVA,* 297 U.S. 288, 346–48, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

**17.** Maj. op. at 1162–1164.

**18.** 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975). For commentary on *Peltier* see 19

How.L.J. 159 (1976); 13 Am.Crim.L.Rev. 317 (1975).

**19.** Maj. op. at 1162.

**20.** 422 U.S. at 535, 95 S.Ct. at 2316 (citations omitted).

**21.** The Court, *id.,* cited *Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); *Johnson v. New Jersey,* 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d

To show why the Court had repeatedly come to the same conclusion, Justice Rehnquist first recounted the two principal functional bases for the exclusionary remedy: (1) the "imperative of judicial integrity"[22] demanding that courts not become "accomplices in the willful disobedience of a Constitution they are sworn to uphold"[23] by permitting the use at trial of evidence unlawfully obtained; and (2) the "deterrent purpose served by the exclusionary rule"[24] in removing an incentive to unlawful police behavior. Because the exclusion of otherwise reliable evidence obstructs the primary factfinding function of a trial, the Court concluded that the retroactive application of the exclusionary remedy should always be based on the outcome of a balancing test weighing the disruption of accurate factfinding against the probable benefits of the exclusion of evidence. In the Court's words: "Whether or not the exclusionary rule should be applied ... depends on whether considerations of either judicial integrity or deterrence of Fourth Amendment violations are sufficiently weighty to require that"[25] evidence of unquestioned "reliability and relevancy"[26] be excluded.

The *Peltier* Court not only set out the interests to be weighed by future courts, but itself undertook a threshold balancing of the competing considerations in order to identify those situations in which the functional purposes of the exclusionary rule are so little served that the balance *always* compels admission of otherwise reliable and relevant evidence. Examining in turn both functional pillars of the exclusionary rule, the Court first observed that "the introduction of evidence which had been seized by law enforcement officials in good-faith compliance with then-prevailing constitutional norms [does] not make the courts 'accomplices in the willful disobedience of a Constitution they are sworn to uphold.'"[27] The Court then noted, with regard to the deterrent aims of the exclusionary remedy, that "[w]here the official action was pursued in complete good faith ... the deterrence rationale loses much of its force"[28] because it "necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct."[29] The Court therefore concluded that a balancing of interests always requires admission of evidence in retroactivity cases where the officer involved acted in reasonable reliance on prior legal pronouncements from authoritative sources. In short, the *Peltier* rule binding on this court is: "evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."[30]

## C. The Peltier *Standard and Detective Cassidy's Search*

The key question we must decide, then, is whether Detective Cassidy, when he opened Ross's brown paper bag and red leather pouch, could possibly have "had knowledge,

1199 (1967); *Fuller v. Alaska*, 393 U.S. 80, 89 S.Ct. 61, 21 L.Ed.2d 212 (1968); *Desist v. United States*, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969); *Jenkins v. Delaware*, 395 U.S. 213, 89 S.Ct. 1677, 23 L.Ed.2d 253 (1969); *Williams v. United States*, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971); and *Hill v. California*, 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971).

**22.** 422 U.S. at 536, 95 S.Ct. at 2317 (quoting *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669 (1960)).

**23.** *Id.* (quoting *Elkins v. United States*, 364 U.S. 206, 223, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960)).

**24.** *Id.*

**25.** *Id.* at 539, 95 S.Ct. at 2318.

**26.** *Id.* (quoting *Linkletter v. Walker*, 381 U.S. 618, 639, 85 S.Ct. 1731, 1743, 14 L.Ed.2d 601 (1965)).

**27.** *Id.* at 536, 95 S.Ct. at 2317 (quoting *Elkins v. United States*, 364 U.S. 206, 223, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960)).

**28.** *Id.* at 539, 95 S.Ct. at 2318 (quoting *Michigan v. Tucker*, 417 U.S. 433, 447, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182 (1974)).

**29.** *Id.*

**30.** *Id.* at 542, 95 S.Ct. at 2320.

or ... properly be[en] charged with knowledge" that his actions violated the Constitution. I conclude he could not have been so charged. To understand why, it is necessary to put the state of the law on 27 November 1978, when Cassidy searched Ross's trunk, into perspective.

Detective Cassidy opened Ross's trunk fifty-three years after the Supreme Court authorized warrantless searches of automobiles in *Carroll v. United States*[31] and seventeen months after the Court decided *United States v. Chadwick.*[32] While *Chadwick* merely held that a warrant is required before police can open personal luggage seized under circumstances in which existing exceptions to the warrant requirement, including the *Carroll* exception, cannot be invoked, and thus in no way directly involved the *Carroll* exception,[33] it is nonetheless of some significance here because it evidently set some people, including some courts, to speculating that the Supreme Court might be prepared to cut back on the *Carroll* exception by removing from its ambit containers found during a lawful warrantless search of a car. Because *Chadwick* must be the pivotal point of any reasonable argument that Detective Cassidy should somehow have been sufficiently prescient to have predicted *Sanders,*[34] it is necessary closely to consider just what *Chadwick* in fact accomplished.

The facts of *Chadwick* are simple.[35] Unknownst to him, Chadwick was in the company of government agents when he met the train on which two accomplices had travelled from San Diego to Boston with a double-locked footlocker containing contraband. As he and his two partners in crime *began loading* the footlocker into the trunk of his parked car, the agents, with ample probable cause, seized the footlocker and arrested all three. The footlocker, reduced to the agents' exclusive possession and control, was removed to the Federal Building, and, after one-and-one-half hours had passed, searched without a warrant. At a pretrial suppression hearing, Chadwick attacked the warrantless search on the basis that it had violated his rights under the Fourth Amendment.[36]

When this litigation reached the Supreme Court, the government seized on the case as a chance to offer the Court three separate opportunities to expand the government's right to conduct searches without a warrant. First, the government argued the rather extreme position that the "Warrant Clause protects only interests traditionally identified with the home."[37] Had the Court accepted this view, the government's right to search without a warrant would have expanded to encompass almost all situations not closely linked to a dwelling. Second, the government argued that the exception to the warrant requirement for

**31.** 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

**32.** 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

**33.** The government initially sought at the original pretrial suppression hearing to justify the search in *Chadwick* on the basis of the *Carroll* exception. *United States v. Chadwick*, 393 F.Supp. 763, 771 (D.Mass.1975). The district court, however, granted the defendant's motion to suppress. *Id.* at 773. The government then filed a motion asking the district court to reconsider and to vacate its grant of the defendants' motion to suppress, this time arguing that the search was justified as a search incident to an arrest. *Id.* at 773–75. The government abandoned its attempt to bring the search within the ambit of *Carroll*, and never again pursued the *Carroll* theory in the ensuing litigation. The auto search exception was not argued by the government at the circuit court

level, *United States v. Chadwick*, 532 F.2d 773, 778–79 (1st Cir. 1976), nor at the Supreme Court level, *United States v. Chadwick*, 433 U.S. 1, 11, 97 S.Ct. 2476, 2483, 53 L.Ed.2d 538 (1977).

**34.** *See* Maj. op. at 1162–1164, arguing that the opinion for the Court in *Sanders* "br[o]k[e] no new ground" but rather "simply explained and applied doctrine welded in place since *Chadwick.*"

**35.** *See United States v. Chadwick*, 433 U.S. 1, 3–5, 97 S.Ct. 2476, 2479–80, 53 L.Ed.2d 538 (1977).

**36.** *United States v. Chadwick*, 393 F.Supp. 763 (D.Mass.1975).

**37.** *United States v. Chadwick*, 433 U.S. 1, 6, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977).

searches incident to an arrest includes the search of "any property in the possession of a person arrested in public, so long as there is probable cause to believe that the property contains contraband or evidence of crime." [38] Had the Court adopted this theory, the exception for searches incident to an arrest would have grown to include even searches "remote in time or place from the arrest." [39] Finally, the government argued by analogy to the *Carroll*, or automobile, exception to the warrant requirement that warrantless searches of other mobile objects do not offend the Fourth Amendment.[40] Had the Court been persuaded to accept this argument, the automobile search exception would have been replaced by a much broader "mobile personalty" exception.

The Court, however, rejected all three government attempts to expand its rights to search without a warrant, leaving search and seizure law where it stood before. Two points about *Chadwick* critical to our analysis of the state of the law at the time Ross's trunk was searched should be noted: (1) *Chadwick* in no way involved the *Carroll* exception to the warrant requirement. The car search exception simply was not in the case. Indeed, the government did not (and sensibly could not) invoke it; [41] and (2) *Chadwick* did not cut back on *any* previously endorsed exception to the warrant requirement; rather, it represented a refusal by the Court to *expand* the government's rights to search without a warrant. In short, when *Chadwick* was decided it would have been quite reasonable to conclude that it had nothing to do with the automobile search exception at all.

Sophisticated observers of the Supreme Court, not unlike astute observers of the Kremlin, however, attempt to draw as much meaning as possible from whatever subtle nuances they think they might be able to detect in Supreme Court opinions. So it did not go unnoticed that Justice Blackmun had drawn a response from another Justice when he wrote in dissent in *Chadwick* that "if the agents had postponed the arrest a few minutes longer until [Chadwick and company] started to drive away, then the car could have been seized, taken to the agents' office, and all its contents—including the footlocker—searched without a warrant." [42] In response, Justice Brennan, writing for himself in a concurrence to the Court's opinion, answered Justice Blackmun by stating that "it is not at all obvious that the agents could legally have searched the footlocker had they seized it after [the suspects] had driven away with it in their car." [43] This comment, taken together with the suggestion that *Chadwick* be read as disclosing that the Court was preparing to adopt the view that personal luggage is entitled to special protection under the Fourth Amendment, set the stage for a flurry of litigation in the lower courts.

On the day *Chadwick* was decided, support for the two sides of this litigation could have been lined up as follows. On record in favor of the longstanding view that containers found in a car come under the *Carroll* exception were not only the two Justices in dissent in *Chadwick* (Justices Blackmun and Rehnquist) but also the explicit holdings of at least four Circuit Courts of Appeals, the Second,[44] the Fifth,[45]

**38.** *Id.* at 14, 97 S.Ct. at 2485.

**39.** *Id.* at 15, 97 S.Ct. at 2485 (quoting *Preston v. United States*, 376 U.S. 364, 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1964)).

**40.** *Id.* at 11–13, 97 S.Ct. at 2483–85.

**41.** *See* note 33 *supra*.

**42.** *United States v. Chadwick*, 433 U.S. 1, 22–23, 97 S.Ct. 2476, 2489–90, 53 L.Ed.2d 538 (1977) (Blackmun, J., dissenting).

**43.** *Id.* at 16–17, 97 S.Ct. at 2486–87 (Brennan, J., concurring).

**44.** *United States v. Tramunti*, 513 F.2d 1087, 1104–05 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975).

**45.** *United States v. Soriano*, 497 F.2d 147 (5th Cir. 1974) (*en banc*), *aff'd sub nom. United States v. Aviles*, 535 F.2d 658 (1976) (mem.), *cert. denied*, 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977).

the Seventh,[46] and the Ninth.[47] On the other side, favoring the position that containers found in a car are *not* covered by *Carroll*, could be found only a possible reading of *Chadwick* and Justice Brennan's hint in his response to Justice Blackmun.

By the time Detective Cassidy searched Ross's trunk, however, the Eighth Circuit,[48] the United States District Court for Connecticut,[49] and two state courts [50] had endorsed the view ultimately to be vindicated by the *Sanders* decision, while the Ninth Circuit [51] had reiterated its support of the previously unanimous pre-*Chadwick* view of those Circuit Courts of Appeals that explicitly had considered the question. Meanwhile, the best informed commentary had concluded that in view of *Chadwick* it was no longer possible to determine how the Supreme Court would treat the matter. Prof. LaFave, in his well known treatise, published at about the time Detective Cassidy opened Ross's trunk, summarized the situation as follows: "It is impossible to predict how the Court would decide [a case like *Sanders*], for the reasoning in *Chadwick* and the Court's car search cases does not all point in a single direction." [52]

I submit that if the answer to the legal question governing Detective Cassidy's conduct was impossible for Professor LaFave, it was at least equally impossible for Cassidy.

So what can we reasonably expect Detective Cassidy to have made of this confusion in the courts? Even assuming that his duties as a detective permitted him sufficient time to keep up to the minute with the very latest judicial pronouncements, not just from the District of Columbia courts but from all around the country, and even further assuming that in interpreting those decisions he had access to the most sophisticated lawyers in the field of criminal procedure, is it reasonable to conclude that on 27 November 1978 Detective Cassidy "had knowledge, or may properly [have] be[en] charged with knowledge" [53] that his search of Ross's paper bag and pouch was unconstitutional? Surely not, unless every faint hint emanating from the Supreme Court of a possible forthcoming shift in position, provided it gains some judicial support somewhere, is to become the standard against which police conduct is to be measured. If so, the only "law" on which a police officer is entitled to rely is that promulgated by the most extreme courts in the country, pending a definitive statement from the Supreme Court.[54]

To see the absurdity of attributing to Detective Cassidy foreknowledge of the outcome of *Sanders*, we might speculate for a moment what would have happened if Detective Cassidy, when he confronted Ross's paper bag and leather pouch, was accompanied by a visiting "judicial squad" composed of Circuit Judges Friendly, Mansfield, and Meskill of the Second Circuit. If we may be permitted to draw conclusions from the outcome of *United States v.*

---

**46.** *United States v. Issod*, 508 F.2d 990, 993 (7th Cir. 1974), *cert. denied*, 421 U.S. 916, 95 S.Ct. 1578, 43 L.Ed.2d 783 (1975).

**47.** *United States v. Evans*, 481 F.2d 990, 993–95 (9th Cir. 1973).

**48.** *United States v. Stevie*, 582 F.2d 1175 (8th Cir. 1978) (*en banc*), *cert. denied*, 443 U.S. 911, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979).

**49.** *United States v. Vallieres*, 443 F.Supp. 186 (D.Conn.1977).

**50.** *Shingleton v. State*, 39 Md.App. 527, 387 A.2d 1134 (1978); *Sanders v. State*, 262 Ark. 595, 559 S.W.2d 704 (1977), *aff'd sub nom. Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979).

**51.** *United States v. Finnegan*, 568 F.2d 637 (9th Cir. 1977).

**52.** 2 W. LaFave, Search and Seizure § 7.2, at 538–39 (1978).

**53.** *United States v. Peltier*, 422 U.S. 531, 542, 95 S.Ct. 2313, 2320, 45 L.Ed.2d 374 (1975).

**54.** Provided, of course, that a district court or circuit court in the jurisdiction in which the police officer finds himself has not ruled on the question. Presumably, a police officer is entitled to rely on the decisions of the federal courts in his jurisdiction, regardless of the rulings of courts elsewhere.

*Ochs*,[55] a Second Circuit case decided after Detective Cassidy's search, had Cassidy been able to turn to this group for advice, two of the three judges would likely have told him that he did *not* need a warrant to open the containers he had found. Yet today the majority charges Cassidy with the knowledge that he *did* need a warrant to satisfy the Constitution.

We imagine that the position of the third judge of the three, Circuit Judge Meskill, would have been agnostic, for in *Ochs* he refused to reach the question. In explanation, he set forth the following admirable description of the state of the law at that time:

> Justice Rehnquist observed in *Cady v. Dombrowski* that the law governing warrantless searches and seizures, especially those involving vehicles, "is something less than a seamless web." So serious is the confusion that six years after *Cady* it can fairly be said that the law in this area is developing without any predictability or even discernible direction. Warrantless vehicle search cases shed virtually no light on fact situations which, if one were to attempt to apply the usual methods of legal reasoning, would seem to be distinguishable only on the basis of trivialities. Thus the precedents cast shadows rather than light, making the resolution of each succeeding case less rather than more certain.
>
> In the two years since the Supreme Court held unreasonable the warrantless search of a footlocker removed by federal agents from the trunk of an automobile, the lower federal courts have been unable to harmonize their approaches to searches

of flight bags, suitcases, and other containers removed from automobiles.... Clearly, when the precedents in such a crucial area of constitutional law offer so little guidance that it is difficult to choose between opposite results on the basis of superior reasoning, our ability to dispense justice is severely hampered.[56]

Nonetheless, today the majority finds that Detective Cassidy should be "charged with knowledge" of the outcome of *Sanders*.[57]

To be sure, the majority has company in its conclusion that *Sanders* should be applied retroactively. Recent Second and Ninth Circuit opinions have come to the same conclusion.[58] Like the majority of this court, the Second Circuit in *Dien*[59] has concluded that *Sanders* made no new law, and thus applies retroactively. In addition, both the Second Circuit in *Dien* and the Ninth Circuit opinion in *MacKay*[60] draw support for the position that *Sanders* applies retroactively from the fact that the warrantless search whose legality was litigated in *Sanders* took place prior to the Supreme Court's decision in *Chadwick*. I will examine these contentions in turn.

### 1. *The Proper Test for Prospectivity*

With respect, I believe the majority of this court as well as the *Dien* court have confused the test to be applied in retroactivity cases not involving the exclusionary rule with the standard the *Peltier* decision set forth to be applied in exclusionary rule cases. In situations *not* involving the retroactive application of the exclusionary remedy, a decision is limited to prospective application only if it meets each of two tests.[61] The first of these two is a threshold test

55. 595 F.2d 1247, 1254–55 (2d Cir. 1979), *cert. denied*, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979). In *Ochs* Judge Friendly wrote for the court "we ... rest our decision on the ground that *Chadwick* did not impair *Chambers* ...." *Id.* at 1255. The facts in *Ochs*, were, of course, not identical to the facts in the present case.

56. *Id.* at 1262–63 (Meskill, J., concurring) (citations omitted).

57. Maj. op. at 1163 n.5.

58. *United States v. Dien*, 615 F.2d 10 (2d Cir. 1980), *aff'g on rehearing* 609 F.2d 1038 (1979); *United States v. MacKay*, 606 F.2d 264 (9th Cir. 1979) (*per curiam*).

59. 615 F.2d at 11.

60. *Id.*; 606 F.2d at 265 n.2.

61. For a succinct and useful summary of the law regarding the retroactive application of constitutional rulings, see 13 Am.Crim.L.Rev. 317 (1975).

which quickly eliminates those new substantive decisions that should not seriously be considered for limitation to prospective effect. This first test was set out by the Supreme Court in *Chevron Oil Co. v. Huson*,[62] in which the Court stated that a case must decide "an issue of first impression whose resolution was not clearly foreshadowed"[63] before the rule of the case can seriously be considered for prospective application only.

Unless the new decision meets the threshold requirements of the *Chevron Oil* test, it is ineligible for full-blown consideration for limitation to prospective application. If it meets the threshold standards, further consideration is then guided by the three factors set forth in the Supreme Court's decision in *Stovall v. Denno*:[64] (1) the purpose of the new result; (2) the extent to which law enforcement officials may have relied on the previous law; and (3) the impact of retroactivity on the administration of justice.[65] The Court has placed the greatest importance on the first of these factors, the purpose of the new result, stating that it has relied "heavily on the factors of the extent of reliance and consequent burden on the administration of justice only when the purpose of the rule in question did not clearly favor either retroactivity or prospectivity."[66]

This two-step analysis, with a threshold test which must be passed before a court moves on to full-scale consideration of the desirability of limiting a ruling to retroac-tive application, however, is now only applied in retroactivity cases *not* involving the exclusionary remedy; *the Supreme Court announced a different approach to be used in exclusionary rule cases in its opinion in United States v. Peltier.* In fact, the majority of the Ninth Circuit, considering *Peltier* before appeal to and reversal by the Supreme Court,[67] as well as the Justices who dissented from the Supreme Court decision in *Peltier*,[68] would have decided *Peltier* by applying just this two-step analysis. Sitting *en banc* the Ninth Circuit, using this analysis, divided seven to six over whether *Almeida-Sanchez v. United States*,[69] the substantive ruling behind *Peltier*, could pass the threshold test so that limitation to prospective application could be seriously considered. The battle was over whether *Almeida-Sanchez* so clearly made new law as not to have been foreshadowed. The Justices dissenting in the Supreme Court as well as the seven-judge majority of the Ninth Circuit concluded that *Almeida-Sanchez* merely "correct[ed] an aberration."[70] The six-judge minority in the Ninth Circuit, however, would have found that *Almeida-Sanchez* passed the threshold test.

*The majority in the Supreme Court, however, rejected this entire analysis. In its place was substituted the standard I have summarized above which requires that evidence not retroactively be excluded unless the responsible officer either "had knowledge"[71] or could "properly be charged with*

62. 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971).

63. *Id.* at 106, 92 S.Ct. at 355. An alternative formulation of the threshold test was provided by Justice Stewart in his dissent in *Milton v. Wainwright*, 407 U.S. 371, 381–82 n.2, 92 S.Ct. 2174, 2180, n.2, 33 L.Ed.2d 1 (1972) (Stewart, J., dissenting). According to Justice Stewart, to qualify for consideration for limitation to prospective effect only, a new rule must plainly overrule past precedents or at least disrupt a long accepted and widely relied upon past practice.

64. 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

65. *Id.* at 297, 87 S.Ct. at 1970.

66. *Desist v. United States*, 394 U.S. 244, 251, 89 S.Ct. 1030, 1034, 22 L.Ed.2d 248 (1969).

67. *United States v. Peltier*, 500 F.2d 985 (9th Cir. 1974) (*en banc*), *rev'd*, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975).

68. Justices Brennan, Douglas, Marshall, and Stewart dissented in *Peltier*.

69. 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973).

70. *United States v. Peltier*, 500 F.2d 985, 989 (9th Cir. 1974) (*en banc*), *rev'd*, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975).

71. 422 U.S. at 542, 95 S.Ct. at 2320.

knowledge"[72] *that his actions were unconstitutional at the time of the search.*

Thus, the Second Circuit, by focusing on "whether *Arkansas v. Sanders* made new law"[73] and the majority of this court, by inquiring whether *Sanders* developed "new law"[74] or "restate[d] . . . doctrine already in place,"[75] are incorrectly applying the initial threshold test appropriate to a consideration of retroactivity outside of the exclusionary remedy context. *Peltier*, however, directs us to apply a different standard to exclusionary rule cases, where the test instead is whether the police official responsible "had knowledge"[76] or could "properly [have] be[en] charged with knowledge"[77] that his actions violated the Constitution. *The appropriate question to ask, then, is not whether lawyers and judges would describe the new decision as a sharp break with past law, but whether a working patrolman can properly be charged with foreknowledge of the new decision's outcome.* These are two quite different matters.

Perhaps it is open to extended argument whether, as the majority suggests, *Sanders* merely "restate[d] and applie[d]"[78] past Supreme Court decisions, and in particular *United States v. Chadwick.*[79] It is not open to question, however, that before *Sanders* was decided the most expert authorities were unable to predict its outcome. It is also undeniable that *Sanders* made new law in the sense that it put an end to the disorder which had broken out in the lower federal courts and the state courts in the wake of *Chadwick. Sanders* "clarified" the law by affirming the decision of the Arkansas Supreme Court; on the other hand, had *Sanders* "clarified" the law by reversing the Arkansas Supreme Court, it would have been easy to argue that *that* outcome also

represented no sharp break with the past. Indeed, that argument would have been easier to make. The point is that before *Sanders* the law was so confused that neither outcome could represent a sharp break. It is impossible to break sharply from chaos.

But the question *Peltier* instructs us to consider is not whether *Sanders* broke with the past, but whether Detective Cassidy can be charged with foreknowledge of its outcome. The answer is plain. If the leading legal authorities, both on and off the bench, could not predict *Sanders's* outcome, how can Detective Cassidy be charged with that prediction? He would have needed a crystal ball neither he nor anyone else had.

I thus conclude that both the majority here and the Second Circuit in *Dien* have erred in part because they have applied the wrong standard. Rather than use the test *Peltier* instructs us to apply to retroactivity cases involving the exclusionary remedy, they have used the older, more general, threshold test to be used in other retroactivity cases. They have thus been led unnecessarily and incorrectly to consider whether lawyers and judges would regard *Sanders* as a sharp, avulsive change in the stream of law, rather than to ask whether Detective Cassidy on the beat could be charged with knowledge of *Sanders's* outcome months before the Supreme Court decided the case. Using the wrong test, they have been led to the wrong results.

### 2. *Did* Sanders *Implicitly Hold* Chadwick *to Apply Retroactively?*

Both the Second Circuit opinion in *Dien*[80] and the Ninth Circuit decision in *MacKay*[81] offer a second basis for applying *Sanders*

---

**72.** *Id.*

**73.** *United States v. Dien,* 615 F.2d 10, 11 (2d Cir. 1980), *aff'g on rehearing,* 609 F.2d 1038 (1979).

**74.** Maj. op. at 1163 n.5.

**75.** *Id.* at 1162.

**76.** 422 U.S. at 542, 95 S.Ct. at 2320.

**77.** *Id.*

**78.** Maj. op. at 1162.

**79.** 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

**80.** *United States v. Dien,* 615 F.2d 10 (2d Cir. 1980).

**81.** 606 F.2d 264 (9th Cir. 1979) (*per curiam*).

retroactively which, though it was not adopted by the majority today, should be addressed. Each of the other circuits has noticed that the search complained of in *Sanders* took place before the Supreme Court decision in *Chadwick*.[82] These courts then conclude that the Supreme Court has decided implicitly to apply *Chadwick* retroactively, which then suggests that *Sanders*, a "clarification" of *Chadwick*, should also be applied retroactively.

This reads far too much into the Court's action in *Sanders*. In the past, the Supreme Court has explicitly refused to read previous cases applying *without discussion* the exclusionary remedy retroactively as foreclosing the retroactivity issue.[83] In fact, in the *Peltier* decision itself the Court referred to the fact that after the Court's landmark decision in *Mapp v. Ohio*,[84] three important subsequent cases applied *Mapp* retroactively *without discussion* before the Court then decided *Linkletter v. Walker*,[85] in which it refused to apply *Mapp* retroactively on collateral review of state convictions. We are thus on notice that it is inappropriate to read too much into a decision which does not so much as mention the retroactivity question.

In addition, the argument would appear to prove too much, for it implies that not only *Sanders* but also *Chadwick* is to be applied retroactively since the search whose legality was tested in *Sanders* occurred before the Court's decision in *Chadwick*. Although anything is perhaps possible until the Supreme Court speaks to the contrary, the nearly unanimous view of those circuits addressing the issue has been that *Chadwick* does *not* apply retroactively.[86]

The only circuit to apply *Chadwick* retroactively, the Eighth Circuit, did so in a case ambiguously remanded from the Supreme Court "for further consideration in light of *United States v. Chadwick*." [87] As Chief Judge Gibson put it in his separate concurrence in that Eighth Circuit case, "The Supreme Court remanded the present case for our consideration in light of *Chadwick*, thus *Chadwick* applies to this case whether or not it applies to any other." [88] But that conclusion, though understandable, is nonetheless faulty, as the Supreme Court's treatment of *Bowen v. United States* [89] proved. *Bowen* involved the retroactive application of *Almeida-Sanchez v. United States*,[90] the case whose retroactive application also was at issue in *Peltier*. A petition for *certiorari* was pending in *Bowen* when the Supreme Court decided *Almeida-Sanchez*. The Court vacated the judgment of the Ninth Circuit in *Bowen* and remanded it for reconsideration "in the light of *Almeida-Sanchez*." [91] The Ninth Circuit reheard the case *en banc* but nevertheless affirmed the conviction at issue, holding that *Almei-*

**82.** Lonnie James Sanders was subjected to search on 23 April 1976. *Chadwick* was not decided until 21 June 1977.

**83.** *United States v. Peltier*, 422 U.S. 531, 535 n.5, 95 S.Ct. 2313, 2316, n.5, 45 L.Ed.2d 374 (1975).

**84.** 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

**85.** 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).

**86.** *See United States v. Calandrella*, 605 F.2d 236, 250–53 (6th Cir.), *cert. denied*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979); *United States v. Cornejo*, 598 F.2d 554, 556–57 (9th Cir. 1979) (*per curiam*); *United States v. Stewart*, 595 F.2d 500, 504 (9th Cir. 1979) (*per curiam*); *United States v. Berry*, 571 F.2d 2 (7th Cir.), *cert. denied*, 439 U.S. 840, 99 S.Ct. 129, 58

L.Ed.2d 138 (1978); *United States v. Reda*, 563 F.2d 510 (2d Cir. 1977) (*per curiam*), *cert. denied*, 435 U.S. 973, 98 S.Ct. 1617, 56 L.Ed.2d 65 (1978); *United States v. Montgomery*, 558 F.2d 311 (5th Cir. 1977) (*per curiam*). *Contra United States v. Schleis*, 582 F.2d 1166, 1171, 1173–74 (8th Cir. 1978) (*en banc*).

**87.** *Schleis v. United States*, 433 U.S. 905, 97 S.Ct. 2968, 53 L.Ed.2d 1089 (1977).

**88.** 582 F.2d at 1175 (Gibson, C. J., concurring).

**89.** 422 U.S. 916, 95 S.Ct. 2569, 45 L.Ed.2d 641 (1975).

**90.** 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973).

**91.** *Bowen v. United States*, 413 U.S. 915, 916, 93 S.Ct. 3069, 37 L.Ed.2d 1038 (1973).

da-Sanchez did not apply retroactively.[92] That conclusion was subsequently approved by the Supreme Court when it once again considered the case.[93]

In sum, it seems at best risky—in view of the Court's recent pronouncement in *Peltier* that an expansion of the exclusionary remedy generally is not to be applied retroactively—to read *Sanders*, in which retroactivity was not even mentioned, to hold that *Chadwick* applies retroactively. The risks are compounded when that conclusion is used to infer that *Sanders* itself applies retroactively. For, as we pointed out above,[94] *Chadwick*, whatever it may have hinted, did not alter the state of the law at that time but merely held the line against a government attempt to expand the rights of its agents to search without warrants. *Sanders*, on the other hand, represents a distinct shift in the law, overruling previous decisions of many of the circuits.[95] Thus, even if *Chadwick* were to be applied retroactively, a very doubtful proposition, *Sanders* should not be.

Thus, neither of the arguments advanced by the majority opinion today and by the *Dien* and *MacKay* courts is persuasive. The Supreme Court has not signaled us to apply either *Chadwick* or *Sanders* retroactively, and, under the appropriate test, we cannot charge Detective Cassidy with foreknowledge of the outcome of *Sanders*, and therefore cannot apply the result of that case to the search he conducted.

The undeniable truth of the matter is that no one could foretell with confidence how *Sanders* would be decided. As for Detective Cassidy's search of Ross's belongings, it is noteworthy that this court, sitting first in a three-judge panel and now *en banc*, has spent six separate opinions deciding, after the fact, with benefit not only of hindsight but also of the briefs and arguments of counsel, that Cassidy should not have looked into Ross's bag without first obtaining a warrant.

Under these circumstances, suppressing the evidence Cassidy uncovered is nothing short of levying an *ex post facto* penalty on utterly blameless police work undertaken in the line of duty. Suppressing the evidence in this case cannot deter the police from doing what they have no way of knowing is wrong. And surely it does little to help deter the likes of Ross from preying on the public. The majority's action today does not deter the constable from blundering by liberating the criminal. It simply liberates the criminal.

## II. THE SUBSTANTIVE REACH OF *SANDERS*

Because a majority of this court has ruled that *Sanders* applies retroactively, and in view of the position of my dissenting colleagues that even prospectively *Sanders* does not apply to paper bags,[96] or even to pouches,[97] I find it necessary to address the majority's principal holding: that *Sanders* covers opaque containers whose contents are not perceptible from the exterior.

Of course, were it not for the Supreme Court's decision in *Arkansas v. Sanders*, the outcome of this case would be obvious; at least since 1925 when the Supreme Court decided *Carroll v. United States*,[98] lower courts have assumed that an officer with probable cause but without a warrant may

**92.** *United States v. Bowen*, 500 F.2d 960 (9th Cir. 1974) (*per curiam*) (*en banc*).

**93.** *Bowen v. United States*, 422 U.S. 916, 95 S.Ct. 2569, 45 L.Ed.2d 641 (1975).

**94.** *See* pp. 1184–1187 *supra*.

**95.** *E. g., United States v. Vento*, 533 F.2d 838, 865–67 (3d Cir. 1976) (paper bag found in car); *United States v. Tramunti*, 513 F.2d 1087, 1104–05 (2d Cir. 1975) (suitcase on back seat of car), *cert. denied*, 432 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *United States v. Soriano*, 497 F.2d 147 (5th Cir. 1974) (*en banc*) (suitcas-

es in trunk of taxicab); *United States v. Evans*, 481 F.2d 990 (9th Cir. 1973) (footlocker in trunk of car). For discussion and collected cases see 2 W. LaFave, Search and Seizure § 7.2(e) (1978 & 1980 Supp.).

**96.** Tamm and Robb, JJ., dissenting *ante*.

**97.** MacKinnon, J., dissenting *ante*.

**98.** 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

stop and search a conveyance and its contents for contraband.[99] *Sanders*, however, holds otherwise.

*In effect,* Sanders *abolished the automobile exception to the warrant requirement as applied in narcotics cases.* Traffickers do not spoon contraband powders into glove compartments or shovel them into trunks; narcotics are transported in containers—after *Sanders* in opaque containers. To search successfully for narcotics hidden in a car a policeman must open the containers he comes upon. But in 1979, after more than a half century of experience with the automobile search exception and in the midst of an epidemic of narcotic addiction, the Court suddenly ruled that before an officer can open a container found in a car he must get a warrant.

This result further complicates the job of the conscientious law officer, adding to the bewildering array of legal issues he faces each time he approaches a car. The *Sanders* dissent summarizes what an officer must do:

> In approaching the vehicle and its occupants, the officer must divide the world of personal property into three groups. If there is probable cause to arrest the occupants, then under *Chimel v. California,* he may search objects within the occupants' immediate control, with or without probable cause. If there is probable cause to search the automobile itself, then under *Carroll* and *Chambers* the entire interior area of the automobile may be searched, with or without a warrant. But under *Chadwick* and [*Sanders*], if any suitcase-like object is found in the car outside the immediate control area of the occupants, it cannot be searched, in the absence of exigent circumstances, without a warrant.[100]

*Sanders* thus adds yet another layer of complexity to the legal analysis a well-intentioned officer approaching a car must carry out on the spot. Unfortunately, if there is contraband in the car and the officer's snap legal judgment is in error, the responsible criminal in all likelihood will go free: either because the officer too precipitously terminated his investigation before discovering the evidence he needed, or because he continued too far or too fast, thereby forcing a judge later to suppress the evidence obtained.

Moreover, police officers on patrol will not be alone in their confusion. We in the courts will also be presented with new Fourth Amendment puzzles to solve; the present litigation undoubtedly is only the beginning of the flood to follow. We will be asked not only to determine whether a container is sufficiently luggage-like to qualify for special treatment under *Sanders,* but also to decide whether a container found somewhere in a car and opened without a warrant conceivably was within grabbing distance of the car's arrested occupant, whether an officer in a given instance could in fact discern the contents of an opaque container from its suspicious size and shape,[101] and so forth.

Perhaps most troubling will be the inevitable stream of consent cases in which the courts will be required to determine whether an investigating officer obtained effective consent before opening a container found in a car, and if he did, whether it was lawfully obtained and voluntarily granted. From our experience with consent searches of dwellings we know each such case will present unique facts, making it impossible to enunciate general rules applicable to most situations.[102] In consequence, state and federal courts will be flooded with ap-

---

99. *See* authorities cited note 95 *supra.*

100. 442 U.S. at 771, 99 S.Ct. at 2597 (Blackmun, J., dissenting) (citations omitted).

101. The opinion of the Court in *Arkansas v. Sanders* exempts from the warrant requirement containers whose "contents can be inferred from their outward appearance." 442 U.S. at 764 n.13, 99 S.Ct. at 2593 n.13.

102. For a recent discussion of the difficulties associated with consent searches see Comment, *Consent to Search in Response to Police Threats to Seek or to Obtain a Search Warrant: Some Alternatives,* 71 J.Crim.L. & Criminology 163 (1980).

peals whose resolution will add little to already-existing law.

The new complications *Sanders* adds to Fourth Amendment analysis and the litigation it has and will continue to spawn would perhaps nonetheless be justified if *Sanders* brought a long-awaited coherence and consistency to search and seizure doctrine. But *Sanders* merely reinforces the existing contradictions. How can it be explained on principled grounds why a policeman without a warrant may force open a locked glove box but not lift the lid on an unlocked jewelry box?[103] Certainly recourse to the doctrine of exigent circumstances is of little help, for it fails to explain why the locked glove box—but not the jewelry box—can be opened without a warrant by an officer who already has secured an automobile at the stationhouse.[104] The law of search warrants as applied to automobiles is no more a seamless web[105] after *Sanders* than before.

With respect, I am unable to understand why *Sanders* and its precursors were decided as they were; even those with the deepest admiration for the work of the Supreme Court have rarely put its development of the law regarding the exclusionary rule at the top of the list for clarity and consistent logic. The question here, however, is whether *Sanders* controls the case before this subordinate court. Plainly, *Sanders* could be distinguished either by following the suggestion of Chief Justice Burger and Justice Stevens concurring in *Sanders* itself,[106] or by adopting an approach similar to that set forth by Judge Tamm writing in dissent here. But I am persuaded that the scope of *Sanders* is such that it would be inappropriate to do so. The Supreme Court

has spoken; we at this court must follow. As a lower court we are required to adhere to the most recent mandate set down by the Supreme Court to the extent with the most conscientious effort we are able to understand its content. To understand what the Court intended *Sanders* to mean—and to determine how narrowly it should be read— it is useful to begin with a fresh examination of the purposes and limitations of search warrants as applied to containers found in automobiles.

1. *The Purposes Served by a Warrant.* As traditionally applied to the search of a *dwelling* the warrant requirement is said to serve at least three purposes.[107] First, it provides an independent confirmation by a neutral and detached magistrate before, not after, a search occurs, that probable cause exists. As a result, in the event a magistrate does not find probable cause, the warrant requirement reduces the level of official intrusion to zero; the intended subject of the search will in all likelihood never become aware a search was even threatened.

Second, the warrant requirement limits the area to be searched and the objects to be seized to those enumerated in the warrant, restricting the scope of the search to the minimum area necessary to accomplish the purpose for which the warrant was authorized. By providing a written record of the basis for the search, a warrant thus helps to limit the range of *post hoc* rationalizations that can later be used to justify a search of broader sweep than was constitutionally authorized at the outset.

---

**103.** A jewelry box presumably cannot be opened without a warrant under the *Sanders* rule because it qualifies as personal luggage, while a glove box, an integral part of the automobile to which it is attached, comes within the *Carroll* exception.

**104.** *See Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

**105.** *Cady v. Dombrowski,* 413 U.S. 433, 440, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706 (1973) ("this branch of the law is something less than a seamless web").

**106.** 442 U.S. at 766–68, 99 S.Ct. at 2594–95 (Burger, C. J., concurring in the judgment). *See* p. 1201, *infra.*

**107.** *See, e. g., Marshall v. Barlow's, Inc.,* 436 U.S. 307, 323, 98 S.Ct. 1816, 1825, 56 L.Ed.2d 305 (1978); *United States v. Chadwick,* 433 U.S. 1, 9, 97 S.Ct. 2476, 2482, 53 L.Ed.2d 538 (1977); *Camara v. Municipal Court,* 387 U.S. 523, 532, 87 S.Ct. 1727, 1732, 18 L.Ed.2d 930 (1967); *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948).

Finally, a warrant reassures the subject of a search that the individuals demanding entrance to his home are authorized police agents with a legal purpose, rather than officers on some frolic of their own. Unquestionably, a citizen is likely to resent even a wholly lawful invasion of his home. But many, perhaps, are able to swallow such an intrusion as a necessary price of citizenship.[108] It is an outrage of a different order—and far more frightening—to be the victim of an invasion by officers abusing their ability to act under color of law. The warrant removes this apprehension.

When a *container* is seized from an *automobile* after a lawful warrantless search of a car, however, these advantages largely evaporate.[109] First, in the event a warrant does not issue for the containers seized, the level of intrusion is reduced modestly, if at all. The car's occupants already have been stopped, detained, and deprived of control over the seized container. In all likelihood, they also have been arrested, for in most cases probable cause to search for contraband will also provide probable cause to arrest its possessors. Should they be arrested, the car's occupants will in addition be subject to searches of their persons [110] and of the area within grabbing distance of them.[111] At this point, if a warrant fails to issue, the additional intrusion they have been spared is surely minimal compared with that which has gone before. By contrast, when a warrant does not issue for the search of a dwelling, the householder is spared even knowledge of the proposed search.

A warrant requirement for containers, moreover, does not define the area to be searched and the objects to be seized; the car has already been searched and the containers seized by the time the warrant issues. Just as obviously, the warrant requirement for searches of containers found in a car does not serve the function of reassuring the occupants of the officer's lawful purpose and authority. After they have been stopped, searched, deprived of control over their property, and taken to the police station, the moment for reassuring the car's occupants of the lawful purpose of the police long since will have passed.

A warrant requirement for *containers* thus provides only a small fraction of the protection assured by the warrant requirement for *dwellings*. How little is left is demonstrated by considering what value a warrant would be if the same rules applied to the search of houses as apply to the search of cars. Were the warrant requirement for houses to parallel that for cars, officers with probable cause would be authorized to enter a house without producing a warrant, to range free throughout the house while examining its contents, to open cupboards, closets and anything else immovable, then to scoop up any suspicious containers for removal to the stationhouse, probably with the householder himself in tow. After considerable delay, the officers would then triumphantly present the startled householder with a warrant authorizing the opening of the containers seized. Innocent householders could be expected to consider this belated appearance of a warrant a nearly useless afterthought. It is hard to see why drivers and passengers should react otherwise.

---

**108.** We pay other similar prices, whose direct relation to our own personal safety and welfare is more obvious, *e. g.*, security searches at airports and entrances to public buildings. But all reasonable searches by authorities are directed at preserving the safety and welfare of us all, *e. g.*, searches for guns and narcotics on the street, even the routine demand for displaying a driver's license to keep unqualified drivers off the thoroughfares. The individual inconvenienced is only paying the price for the common (including his own) good.

**109.** *Arkansas v. Sanders*, 442 U.S. 753, 770, 99 S.Ct. 2586, 2596, 61 L.Ed.2d 235 (1979) (Blackmun, J., dissenting) ("the additional protection provided by a search warrant will be minimal").

**110.** *See, e. g., United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Gustafson v. Florida*, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973).

**111.** *See Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

Thus, given that a warrant is not required to search an automobile in the first place, the incremental protection provided by a warrant requirement applied to containers is minimal. But this alone is insufficient cause to abandon the warrant requirement. When constitutional rights are at stake, even modest additional guarantees should not be forgone unless it is necessary to do so.

2. *When is a Warrant Impractical?* Traditionally, it has been considered necessary to forgo the benefits of a warrant when it is "impractical" to apply to a magistrate to obtain one. The principal reason why it may be impractical for an investigator to get a warrant is that the status quo cannot be preserved during the attendant delay.[112] Because of the element of surprise, it is normally possible to obtain a warrant before searching a dwelling; the occupants usually are not forewarned and are unable to take evasive action. Situations involving stopped automobiles, however, cannot so easily be frozen while a warrant is obtained. So it has always been held that the warrant requirement does not apply to the search of an occupied automobile.[113]

But why can the situation not be frozen when an automobile is stopped? After all, a temporary seizure while a warrant is

obtained could precede the search. Today, the Court answers this question by focusing on the practical difficulties associated with the temporary seizure of a car.[114] But while the first automobile search case decided by the Supreme Court, *Carroll v. United States*,[115] uses language suggesting that the impracticality of obtaining a warrant derives from the difficulties associated with handling automobiles, *underlying the* Carroll *Court's analysis is the assumption that the source of that impracticality arises from the problems involved in securing the suspects, not their contraband or their vehicle, while a warrant is sought.* It is worth reviewing the basis for the *Carroll* decision.

In *Carroll* the *physical practicality* of seizing the vehicle and the suspects while seeking a warrant could not have been challenged because the vehicle and the suspects in fact *were* seized following the search and taken to a place where a warrant could have been obtained, thus establishing that the police were physically capable of guarding the car, its contents and the suspects while *application to a magistrate for a warrant was made.* After the warrantless search of the car in *Carroll* for liquor possessed in violation of the Volstead Act, the officers involved "took the two defendants and the liquor and the car to Grand Rap-

---

112. *See, e. g., Carroll v. United States*, 267 U.S. 132, 153, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925) (automobiles); *Warden v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782 (1967) (houses).

113. *Arkansas v. Sanders*, 442 U.S. 753, 760, 99 S.Ct. 2586, 2591, 61 L.Ed.2d 235 (1979) ("One of the circumstances in which the Constitution does not require a search warrant is when the police stop an automobile on the street or highway because they have probable cause to believe it contains contraband or evidence of a crime."). Unoccupied automobiles, however, may be treated differently. *See Coolidge v. New Hampshire*, 403 U.S. 443, 461–62, 91 S.Ct. 2022, 2035–36, 29 L.Ed.2d 564 (1971).

114. *Arkansas v. Sanders*, 442 U.S. 753, 765, 99 S.Ct. 2586, 2594, 61 L.Ed.2d 235 (citation omitted):

We view, however, the seizure of a suitcase as quite different from the seizure of an automobile. In *Chambers*, if the Court had

required seizure and holding of the vehicle, it would have imposed a constitutional requirement upon police departments of all sizes around the country to have available the people and equipment necessary to transport impounded automobiles to some central location until warrants could be secured. Moreover, once seized automobiles were taken from the highway the police would be responsible for providing some appropriate location where they could be kept, with due regard to the safety of the vehicles and their contents, until a magistrate ruled on the application for a warrant. Such a constitutional requirement therefore would have imposed severe, even impossible, burdens on many police departments. No comparable burdens are likely to exist with respect to the seizure of personal luggage.

115. 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

ids," [116] the nearest city, a location at which a warrant presumably could have been obtained before the officers tore open the seats of the car to find the liquor concealed inside. The Oldsmobile roadster that carried the liquor in *Carroll* also was impounded as required by the Volstead Act, which specified that "[w]henever intoxicating liquors transported or possessed illegally shall be seized by an officer he shall take possession of the vehicle and team or automobile, boat, air or water craft, or any other conveyance." [117] The vehicle and suspects having been in fact seized in *Carroll*, it is undeniable that, at least in the circumstances of that case, it was physically possible for the officers to have obtained a warrant before they tore open the car seats.

Although Chief Justice Taft's opinion for the *Carroll* Court does not explicate the real source of the problem in that case in full, not much analysis is needed to see the true nature of the difficulty the case presented. When the "Carroll boys" [118] were stopped by police officers on the road from Detroit to Grand Rapids, the officers had neither a legal basis for arresting them nor for seizing their roadster prior to a search. The officers did not have an arrest warrant for Carroll or his accomplices. Under the Volstead Act a first offense was only a misdemeanor, and a warrantless arrest for a misdemeanor required at that time not just probable cause but that the offense had been committed in the presence of the arresting officer. [119] Of course in 1925 it was implicitly understood that there was no half-way "stop" of the type eventually authorized by *Terry v. Ohio*. [120] Under the common law rules applicable in *Carroll* there was no room for investigative detention. Thus, the police in *Carroll* had no

grounds to arrest or even temporarily to detain the *occupants* of the roadster, and any temporary detention while a search warrant or an arrest warrant was sought would have been unlawful, whatever its physical practicality.

Before the Supreme Court, Carroll and his accomplice Kiro assumed that the search of their car could only be justified as a search incident to an arrest. On this theory, their arrest could not be justified by the fruits of the search which preceded it, because the search could only be justified as an incident of the subsequent arrest. But an arrest for the misdemeanor with which they were charged could not have been made prior to the search, because the officers had only probable cause, but had not seen the misdemeanor committed in their presence, when they searched the roadster. Because the arrest was unlawful, the search was unlawful, argued Carroll and Kiro, [121] and their conviction had to be overturned. Justice McReynolds, joined by Justice Sutherland, adopted this view in dissent. [122]

Chief Justice Taft writing for the majority, however, held that a warrantless *search*, if not a warrantless arrest for a misdemeanor, could be justified on the basis of probable cause alone. [123] The warrantless search of the roadster was thus independently justified. In effect, Chief Justice Taft turned Carroll's theory on its head, *justifying the arrests as incident to and dependent on the fruits of a warrantless search*, rather than the warrantless search as incident to the arrests. Whereas a warrant would have been required before "a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained," [124] a warrant was not required for "a search of a

---

**116.** *Id.* at 136, 45 S.Ct. at 281.

**117.** *Id.* at 144, 45 S.Ct. at 282 (quoting National Prohibition Act, ch. 85, tit. II, § 26, 41 Stat. 315 (1919)).

**118.** 267 U.S. at 160, 45 S.Ct. at 287.

**119.** 267 U.S. at 156–58, 45 S.Ct. at 286–87.

**120.** 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

**121.** 267 U.S. at 136–42, 45 S.Ct. at 281–82.

**122.** *Id.* at 163, 45 S.Ct. at 288 (McReynolds, J., dissenting).

**123.** *Id.* at 158–59, 45 S.Ct. at 287.

**124.** *Id.* at 153, 45 S.Ct. at 285.

ship, motor boat, wagon or automobile, *for contraband goods,* [since] it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." [125]

But a vehicle can move quickly "out of the locality" only if it *and its driver* are free to go; so plainly and especially on the facts of *Carroll, Chief Justice Taft's unstated assumption is that Carroll would have been free to drive away because it was not legally permissible to detain him and his accomplices while a warrant was sought.* The basis of the *Carroll* decision that a warrant is not required before a search of an automobile on probable cause that it contains contraband thus does *not* rest on the assumption that it is *physically impractical* to seize cars and suspects temporarily while a warrant is sought, but on the quite distinct assumption that *it was legally impossible so to detain the suspects and impound their car.*[126]

Indeed, the Supreme Court itself appears implicitly and perhaps unconsciously to have understood that the impracticality of obtaining a warrant depends not on the difficulty of seizing and guarding an automobile, but on the problems associated with detaining its occupants. Thus six years after *Carroll* the Court upheld a warrantless search of an automobile initiated after the driver had entered it but before he had put it into motion.[127] And another seven years later, the Court endorsed a warrantless search of a car initiated as the driver alighted after it was brought to a halt in a garage.[128] But in *Coolidge v. New Hampshire,*[129] the Court refused to accept a warrantless search of an *unoccupied* car whose owner had already been arrested elsewhere.

Turning to modern day law, we then see that *the real problem with a warrant re-*quirement for automobile searches results from the difficulties temporary detention poses for suspects and the police who must detain them.* Holding suspects for an extended period in limbo with the police will cause vexatious problems for the police, the courts, and not least, for suspects, who, even if guilty, will be denied access to a lawyer and the other rights and protections afforded an arrested person.

I submit that the *treatment of suspects,* not automobiles, should once *again* become *the principal concern* of courts grappling with the auto search exception. The Supreme Court would consistently clarify the aims of the Fourth Amendment were it to state that the relevant impracticality is not that associated with the seizure of cars, but rather that associated with *effectively shifting from patrolman to magistrate the decision whether to intrude massively on the rights of a car's occupants.* From such a changed perspective, it would quickly be perceived that *the warrant requirement is more harmful than helpful,* as I believe experience with the *Sanders* rule ultimately will prove.

In *Carroll* there were legal impediments to the temporary seizure of automobiles and suspects while a warrant was obtained. Those legal impediments, erected to shield citizens from unnecessary or improper detentions, are now rarely applicable. *But the interests of suspects protected by those impediments are as important today as ever. The imposition of a warrant requirement for containers puts those interests in jeopardy, because in most situations a warrant requirement implies the temporary detention of suspects.* At best, it will present suspects with a cruel choice: consent to a search or be detained while a warrant is

---

**125.** *Id.* (emphasis added).

**126.** *Accord* Wilson, *The Warrantless Automobile Search: Exception Without Justification,* 32 Hastings L.J. 127, 131–32 (1980).

**127.** *Husty v. United States,* 282 U.S. 694, 51 S.Ct. 89, 75 L.Ed. 740 (1931).

**128.** *Scher v. United States,* 305 U.S. 251, 59 S.Ct. 174, 83 L.Ed. 151 (1938).

**129.** 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

obtained.[130] Absent consent to a search on the spot, detention will usually be necessary to ensure that the suspects, if guilty, do not flee. In legal terms, an arrest will be necessary while the warrant is sought; probable cause to search will also provide probable cause to arrest in most instances involving contraband of which possession is criminal.

Here an intriguing problem for the police will arise in the event a warrant does not issue: the determination by a magistrate that probable cause to search did not exist will strongly suggest probable cause to arrest also did not exist. In consequence, a constitutional tort action [131] or an action under 42 U.S.C. § 1983 apparently will then lie against the arresting officer on the basis that the arrest was unconstitutional, putting the officer to the test of proving good faith in court.[132] Many officers thus may feel under considerable pressure to obtain consent, rather than be put in jeopardy by attempting to obtain a warrant. One way to get consent may be to threaten not only detention tantamount to arrest, but its trappings as well: booking, incarceration,

fingerprinting and so forth. For those who have no criminal record—and who are innocent—the threat of a booking will have a powerfully coercive effect in view of what are widely perceived to be the lifelong consequences of an arrest record. As a result, the characterization of automobile searches as based on "consent" will often ring false.

With a warrant requirement, we therefore must expect much litigation on what constitutes consent, and how the police may obtain it. These problems will be complicated by the fact that consent will almost invariably result in waiver not only of the warrant requirement but also of the probable cause requirement. Without being unduly cynical about the behavior of police in general, it is possible to predict that some police on some occasions will use the threat of obtaining a warrant, with consequent hours of detention and delay, to obtain consent to searches *not* justified by probable cause. In appropriate circumstances we can then expect courts faced with these situations to rule that "consent" was vitiated by the totality of the circumstances

130. The difficulties associated with consent searches are considerable. The suspect who consents to a search waives constitutional protections guaranteed by the Fourth Amendment. To be effective such waiver must be free and voluntary. In judging whether such a waiver is truly voluntary, courts look to "all the circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 249, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (1973). In many circumstances courts have found that apparent consent was not effective. For example, police threats will vitiate consent. *See, e. g., Waldron v. United States,* 219 F.2d 37 (D.C.Cir.1955) (policemen threatened suspect's eighteen-year-old wife that they would not be responsible for what might happen to suspect's apartment should they be forced to get warrant); *United States v. Kampbell,* 574 F.2d 962 (8th Cir. 1978) (officers threaten to ransack home if required to get a warrant). Consent is not effective if it is based on reliance on a policeman's false assertion. *E. g., Go-Bart Importing Co. v. United States,* 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931) (false claim to have had a warrant). Moreover, consent will not be valid if the suspect reasonably believed that he did not have any option but to consent. *E. g., Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) (no consent when search made pursuant

to an invalid warrant); *Amos v. United States,* 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921) (consent invalid where extracted by "implied coercion" from suspect's wife by federal agents who said they had come to search for violations of the revenue laws). Indeed, this court has noted that "true consent, free of fear or pressure, is not so readily to be found" when a suspect is confronting the police. *Judd v. United States,* 190 F.2d 649, 651 (D.C.Cir.1951). Most courts, however, do not find consent to have been vitiated when it is granted in response to police threats to obtain a search warrant. For citations and analysis of this problem see Comment, *Consent to Search in Response to Police Threats to Seek or to Obtain a Search Warrant: Some Alternatives,* 71 J.Crim.L. Criminology 163 (1980).

131. *See, e. g., Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

132. Officers of the executive branch are immune from liability when their action is reasonable "in light of all the circumstances, coupled with good-faith belief." *Scheuer v. Rhodes,* 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1691–92, 40 L.Ed.2d 90 (1974).

surrounding it.[133] In the face of such rulings, other, well-intentioned, police will become uncertain whether, if they rely on consent, they will destroy their case. At least in important investigations, then, they will become reluctant to accept consent, but will feel compelled to insist on obtaining a warrant when there is ample probable cause, even over the protests of citizens who would just as soon permit an empty suitcase to be opened so they can be on their way.

Worse yet, undisciplined police who wish to harass citizens for whatever reason will be given a potent device to do so: the arrest followed by a predictably fruitless, but long drawn out, attempt to get a warrant. Unfortunately, it will be next to impossible for courts to control this type of abuse without damning the police when they do seek a warrant, as well as when they do not. Chaos in the courts is the most likely result.

It is my conclusion that *the warrant requirement is therefore impractical whenever the detention of the suspect during the time required to get the warrant is necessary and not independently justified.* Because this is normally the case whenever a vehicle is stopped on probable cause that it contains contraband, I would therefore *apply the automobile search exception not only to searches of the integral parts of an automobile but to its contents as well.*

3. *The Supreme Court's Views on When a Warrant is Impractical.* The Supreme Court, however, finds its impracticality elsewhere. In *Sanders* it concluded that, while it is not practical for the police to get a warrant before searching a car, it is practical to get a warrant before opening containers inside. The reason provided by the Court[134] for this distinction is that police anywhere can be assumed to have adequate facilities for securing containers, though not all of the nation's police can be expected to have the facilities necessary to secure automobiles. The Court thus focuses, not on the impracticality of shifting to a magistrate the decision whether to intrude on the life of a suspect, but on the impracticality of storing cars.

With all due respect, this explanation of impracticality is itself most impractical and theoretical. For surely we can assume that any police department, no matter how small or rural, can transport and impound vehicles illegally parked or abandoned in hazardous locations. Tow trucks are available everywhere and it is a common experience that police are prepared to resort to them. A "boot" on one wheel and one officer to watch over the car would be entirely sufficient to preserve immobile the auto and its contents. The Supreme Court apparently believes, however, that some small police departments may not be able to supply whatever additional resources are necessary to establish a chain of custody sufficient to secure not only a vehicle but evidence within against tampering while a warrant is sought.

The Court is drawing a fine line here. In fact, the difference between the practicality of obtaining a warrant before searching a car and before searching luggage found inside is small. When a warrant is required before a container is opened, the investigating officer must stop the car, search it for containers capable of concealing contraband, seize the containers and arrest the driver, secure the car, transport the driver to a secure location, and then obtain a warrant. When a warrant is required before an auto is searched, on the other hand, nothing is changed except that the officer also is required to secure the evidence that might be within the car against the possibility of tampering or removal—a task in most cases no more difficult than "seizing" an illegally parked car and protecting it against intrusion by keeping it from the public.

---

133. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (determination of the voluntariness of consent to an auto search is to be based on the totality of the circumstances).

134. *Arkansas v. Sanders*, 442 U.S. 753, 765 n.14, 99 S.Ct. 2586, 2594 n.14, 61 L.Ed.2d 235 (1979).

But when a line has to be drawn there is little merit in making the obvious observation that points on either side of the line are separated by very little distance. And once the Court had ruled in *United States v. Chadwick* [135] that the warrant requirement applies to luggage but not to cars, it could not avoid deciding whether luggage in a car is or is not subject to the warrant requirement, although in *Chadwick* it sought to do so.[136] It had to draw a line somewhere.

4. *Should* Sanders *Be Distinguished?* Based on the confusion in cases attempting to follow both *Chadwick* and its "clarification" in *Sanders*, it appears that the point chosen by the Court was not the best place to draw the line. In fact, because I believe the emphasis should be changed from the impracticality of impounding cars to the impracticality of shifting to a magistrate the decision to intrude significantly on a citizen's rights, I would not have drawn a line at all. But if a line is to be drawn, it should be clearly and cleanly done so that courts and law officers can know where they stand. Thus, because I believe there should be as little doubt as possible in anyone's mind whether or not a warrant is required, I cannot accept the invitation this present case provides to distinguish *Sanders* —and thus perhaps to add to the confusion.

Although it is tempting, I do not follow the approach suggested but not asserted by Chief Justice Burger (joined by Justice Stevens) in his concurrence [137] in *Sanders*. He suggests *Sanders* might be limited to situations in which the police have probable cause to search luggage and that *Sanders* might not apply to situations in which the police have less specific information about the location of contraband within a car. Under such a rule a policeman could search luggage found in a car provided he had probable cause to believe contraband could be found somewhere in the car, but did not have sufficient knowledge the contraband was in the luggage. This suggestion, while it would limit the deleterious impact of *Sanders*, does not seem consistent with or easily integrated within the Court's analysis of the warrant requirement by reference to practicability. The practicability of obtaining a warrant does not turn on the specificity of an officer's knowledge of the location of contraband within a car. An even more telling difficulty with this approach is that it puts the prosecutor in an awkward position: at a suppression hearing he must show that the investigating officer knew enough but not too much, that he had sufficient knowledge to establish probable cause but insufficient knowledge to know exactly where the contraband was located. This approach thus not only lacks a functional foundation but would be unworkable in practice.

The second principal approach suggested for limiting *Sanders* is that adopted by the dissenters today,[138] who would find some containers too flimsy to support a legitimate expectation of privacy. Their approach also suffers from debilitating defects. First, it does not focus on the problems of the warrant requirement as applied to automobiles, but instead sweepingly withdraws certain classes of containers from all Fourth Amendment protection. This may be unwise and unnecessary. Expectations of privacy do not correlate well with sturdiness; the most intimate and private letter may lovingly be carried in its original—and now opened—envelope. Moreover, this approach invites endless litigation about what containers are within and what containers are without the ambit of Fourth Amendment protection. In Fourth Amendment law, we need clearer lines and fewer cases.

---

135. 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

136. *Id.* at 11, 97 S.Ct. at 2483 ("The Government does not contend that the footlocker's brief contact with Chadwick's car makes this an automobile search . . . ."). A well-known case book describes the automobile search issue as having been "sidestepped" in *Chadwick.*

Y. Kamisar, W. LaFave, J. Israel, Modern Criminal Procedure 352 (5th ed. 1980).

137. 442 U.S. at 766–68, 99 S.Ct. at 2594–95 (Burger, C.J., concurring in the judgment).

138. *See* the opinions of Judges Tamm, MacKinnon and Robb *ante.*

In sum, I believe that because the Court has chosen to draw a line at luggage, we should respect that line and seek to maintain its clarity and consistency. While I would prefer that the Supreme Court shift its focus from the impracticality of storing evidence to the impracticality of shifting the decision to intrude from the patrolman to the magistrate, until it chooses to do so, if ever, our duty is to carry out its directives. For that reason, I concur in the conclusion reached by the majority concerning the reach of *Sanders* as applied prospectively.

5. *The Contraband Element.* Before turning in Part III of this opinion to consider the adverse impact of the exclusionary rule both in this case and more generally I wish to draw attention here to another significant element to be found in the seminal *Carroll* opinion that has sometimes been overlooked: the weight given the fact that the search was undertaken to locate contraband, not property to which private rights could attach.[139]

In *Carroll* it is noteworthy that Chief Justice Taft emphasized that *the statute authorizing the search at issue was primarily directed at the suppression of contraband*, and only secondarily at the conviction of its possessors.[140] *It is clear from the opinion that Taft viewed this fact as supporting the legitimacy of warrantless searches not incident to a valid arrest un-*dertaken in furtherance of the statute.[141] And to establish the proposition that warrantless searches of conveyances had long been authorized he pointed to the numerous statutes enacted and enforced since the nation's beginning directed specifically at the suppression of contraband and smuggled goods.[142] Throughout the opinion there is a constant undertone emphasizing that the liquor seized was contraband.

Although Chief Justice Taft does not much elaborate the point, the basis for this emphasis plainly is to be found in the fact that the possessor of contraband has no property interest in it to counterbalance the government's interest in reclaiming or suppressing it. Of course, at least since *Katz v. United States*[143] consolidated the line of cases which had eroded the notion that only contraband, fruits, and instrumentalities of crime, but not "mere evidence," could be seized by the government,[144] we no longer think of Fourth Amendment rights solely as incidental to property rights. Fourth Amendment rights are now viewed as vindicating "reasonable expectations of privacy" even in situations in which no property interest exists.[145]

Nonetheless, as the *Carroll* opinion shows, *in determining whether a search with or without a warrant is "unreasonable" under the Fourth Amendment* it is historically and functionally correct to give weight to the fact that *in seeking contraband the govern-*

---

139. The Court itself noted this close connection between the acceptability of warrantless searches and the suspected presence of contraband some years later in its opinion in *United States v. Di Re*, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948), in which it pointed out that "[a]n automobile ... was an almost indispensable instrumentality in large-scale violation of the National Prohibition Act, and the car itself therefore was treated somewhat as an offender and became contraband." *Id.* at 586, 68 S.Ct. at 224.

140. *Carroll v. United States*, 267 U.S. 132, 155, 45 S.Ct. 280, 286, 69 L.Ed. 543 (1925) ("Section 26 was intended to reach and destroy the forbidden liquor in transportation and the provisions for forfeiture of the vehicle and the arrest of the transporter were incidental.").

141. *Id.*

142. *Id.* at 150–53, 45 S.Ct. at 284–85.

143. 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

144. "[T]he premise that property interests control the right of the Government to search and seize has been discredited." *Id.* at 353, 88 S.Ct. at 512 (quoting *Warden v. Hayden*, 387 U.S. 294, 304, 87 S.Ct. 1642, 1648, 18 L.Ed.2d 782 (1967)).

145. *Id.* at 361, 88 S.Ct. at 516 (Harlan, J., concurring) ("My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.' ").

*ment is seeking that which it alone has a right to possess*, whereas when the government seeks "mere evidence" it wishes to obtain that which it normally has no right to possess or control but in which it now claims a superior interest. *There can be no privacy interest in contraband.*

## III. WE CAN DO BETTER WITHOUT THE EXCLUSIONARY REMEDY

It has now been sixty-seven years since the Supreme Court first applied the exclusionary remedy to evidence obtained in violation of the Fourth Amendment alone,[146] and twenty years since the rule was first used against the states.[147] During that period some of our finest judges and lawyers have advanced arguments in support of the rule,[148] so much so that many now reflexively equate zealous concern for cherished Fourth Amendment guarantees with spirited support for the exclusionary rule. Throughout the rule's history, however, others, no less distinguished, have opposed the rule and its extensions.[149] Over the years the arguments pro and con have been well

rehearsed and positions have crystallized to the extent that it sometimes appears as though almost any debate over the merits of the rule will likely degenerate into a polarized contest between proponents of the rule who see their adversaries as lamentably insensitive to violations of basic constitutional freedoms and opponents of the rule who, in turn, accuse the rule's supporters of softness on crime and criminals.

Along with the exclusionary rule itself, this stereotyped debate between polarized factions simplistically identified with "law and order" and "individual rights" has become an anachronism we can no longer afford. The assumptions which gave rise to the rule and to the stereotyped positions pro and con are no longer valid. Times and circumstances have changed. The rule should now be abolished, not out of an atavistic and nostalgic desire to return to an earlier, more naive era, in which we were content to entrust the protection of individual freedoms to state governments close to the people rather than to the federal judiciary,[150] but rather in frank recogni-

---

146. *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). *Weeks* was presaged by *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886). *Boyd*, however, had strong Fifth Amendment overtones and in a case involving only the Fourth Amendment, *Adams v. New York*, 192 U.S. 585, 24 S.Ct. 372, 48 L.Ed. 575 (1904), the Court adhered to the common-law rule that a court will not consider the method by which competent evidence has been acquired.

147. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Earlier in 1949 the Court had held in *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), that the Fourth Amendment substantive rights are "implicit in 'the concept of ordered liberty,'" *id.* at 27, 69 S.Ct. at 1361 (quoting *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937)), and therefore enforceable under the Fourteenth Amendment against the states. *Id.* at 27–28, 69 S.Ct. at 1361–62. Nonetheless, the Court quite reasonably concluded that the exclusionary remedy was not "an essential ingredient" of Fourth Amendment substantive rights. *Id.* at 29, 69 S.Ct. at 1362. In 1961 the Court abandoned that limitation, holding the exclusionary remedy applicable to the states in *Mapp*.

148. *E. g., Olmstead v. United States*, 277 U.S. 438, 470, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (Holmes, J., dissenting) ("We have to choose, and for my part I think it a less evil that some criminals should escape than that the government should play an ignoble part."); *id.* at 485 (Brandeis, J., dissenting) ("Crime is contagious. If the Government becomes a law breaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.").

149. *E. g., People v. DeFore*, 242 N.Y. 13, 21, 150 N.E. 585 (Cardozo, J.) ("The criminal is to go free because the constable has blundered."), *cert. denied*, 270 U.S. 657, 46 S.Ct. 353, 70 L.Ed. 784 (1926). Dean Wigmore put his opposition to the exclusionary remedy this way: "'Titus, you have been found guilty of conducting a lottery; Flavius, you have confessedly violated the Constitution. Titus ought to suffer imprisonment for crime, and Flavius for contempt. But no! We shall let you *both* go free.... Our way of upholding the Constitution is not to strike at the man who breaks it, but to let off somebody else who broke something else.'"

150. The first eight amendments to the Constitution were held inapplicable to the states in *Barron v. Mayor of Baltimore*, 32 U.S. (7 Pet.)

tion that the tools now available to federal judges to combat violations of the Fourth Amendment are far more varied and potent than once they were. At one time it could plausibly be argued that the exclusionary rule, with all its glaring defects, was the best remedy that could be fashioned by federal judges, sworn to uphold the Constitution but given only strictly limited powers with which to do so. But this is no longer so. We can now provide better protections against constitutional violations without undercutting our ability to bring criminals to justice. The time has come to relegate the exclusionary rule to history.

## A. *Defects of the Exclusionary Rule*

The problems the exclusionary rule poses for those charged with the task of fighting crime are plain enough not to require elaboration here.[151] Nor is it necessary to add that those problems are unnecessarily compounded when, as the majority has done in the present case, overly zealous courts exclude evidence obtained by a police officer whose actions cannot be faulted on the law

established at the time. The excesses in which the majority today indulges, however, are not an inevitable concomitant of the exclusionary rule, and, in fairness, should not be charged against it. But even when the rule is properly applied, it can be an imposing obstacle to the policeman and the prosecutor.

To be sure, the case can be overstated. At least in principle, the rule denies the prosecutor only evidence he would anyway not have had if the police had kept within the bounds of the Constitution. Even so, too many prosecutions, like the prosecution of Albert Ross, have gone awry, not as a result of intentional police misconduct, and certainly not because of any doubt about the guilt of the criminal, but simply because a court, with the benefit of time to reflect and of hindsight, concludes that an officer acting under pressure in the field, maybe under fear for his own life, failed properly to apply the often confused and confusing standards of conduct set out by courts interpreting the Constitution.[152]

243, 250, 8 L.Ed. 672 (1833) (Marshall, C.J.) ("Had congress engaged in the extraordinary occupation of improving the constitutions of the several states, by affording the people additional protection from the exercise of power by their own governments, in matters which concerned themselves alone, they would have declared this purpose in plain and intelligible language.").

**151.** *See* Wilkey, *The exclusionary rule: why suppress valid evidence?* 62 Judicature 215 (1978); Wilkey, *A call for alternatives to the exclusionary rule: let Congress and the trial court speak, id.* at 351, 88 S.Ct. at 511 (1979).

**152.** The exclusionary remedy applies whether or not the officer involved acted in good faith. This is anomalous in view of the fact that an officer of the executive branch who acts in good faith is immune to civil liability. Thus, for example, a suspect whose innocence is later proved at trial cannot recover damages against the arresting officer if the arrest was based on probable cause. *Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967) ("A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does."). Similarly, an officer is not liable for damages if he acts under a statute later held unconstitutional either on its face or as applied,

provided at the time of his actions he reasonably believed the statute to be valid. *Id.* The rule generally is that officers of the executive branch are immune from liability whenever their actions are made in good faith and are reasonable in light of all the circumstances. *Scheuer v. Rhodes,* 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1691–92, 40 L.Ed.2d 90 (1974). The immunity of executive branch officials for the consequences of their good-faith reasonable actions is predicated on the assumption that "it is better to risk some error and possible injury from such error than [for such officials] not to decide or act at all." *Id.* at 242, 94 S.Ct. at 1689. As Justice White pointed out in his dissent in *Stone v. Powell,* 429 U.S. 465, 541–42, 96 S.Ct. 3037, 3074, 49 L.Ed.2d 1067 (1976): "If the defendant in criminal cases may not recover for a mistaken but good-faith invasion of his privacy, it makes even less sense to exclude the evidence solely on his behalf. He is not at all recompensed for the invasion by merely getting his property back. It is often contraband and stolen property to which he is not entitled in any event. He has been charged with crime and is seeking to have probative evidence against him excluded, although often it is the instrumentality of the crime. There is very little equity in the defendant's side in these circumstances. The exclusionary rule, a judicial construct, seriously shortchanges the public interest as presently applied."

Unfortunately perhaps, when that happens it is the criminal suspect, not the officer, who is before the court. So the court cannot punish the officer. Under the dictates of the exclusionary rule, the court instead punishes the public by releasing a potentially dangerous criminal to resume his criminal depredations. Suffice it to say that the absurdity of this result, if obscure to those whose legal training clouds their judgment, is manifest to most laypeople.[153]

Rather than dwell on what should be plain to everyone, I would like to emphasize other, perhaps less obvious but equally unfortunate, consequences of this outmoded rule. First, the rule diverts resources allocated to the criminal justice system from the trial of criminals to the trial of the police.[154] Innocent criminal defendants may therefore be denied a real chance for a fair trial at least in part because the limited resources available have been diverted to consideration of exclusionary rule questions. These innocent defendants represent a class victimized by the exclusionary rule which often goes unnoticed because attention normally is focused on the boon the rule provides to the guilty. Of course, many a guilty man owes his freedom to the rule; the assumption underlying the rule is that holding the police in check is more important than holding criminals in check, whatever the common experience of city dwellers might be to the contrary. *Innocent* defendants, however, may, with the public, be indirect victims of the rule.

To understand how the innocent defendant is victimized by the diversion of scarce resources from criminal trials to police discipline, it is necessary briefly to consider how our criminal justice system now operates in fact, if not in theory. The health of the criminal justice system depends in large measure on the quantity and quality of the resources committed to it. Experience unfortunately has shown that the polity is unwilling to devote more than a rather small share of the gross national product to criminal justice. Nonetheless, we in the United States profess to have only the highest ideals when it comes to what we will openly tolerate as a minimum level of due process in criminal adjudication. Moreover, under our constitutional scheme, we have delegated the task of defining that minimum acceptable level of due process principally to the judiciary. But judges work piecemeal and without responsibility for the sacrifices that must be made elsewhere whenever they "purchase" an additional element of due process by holding that it is an indispensable element of a fair trial. This ensures that more due process will be required than the system can afford to pay for. As a result, trials have now been priced too high to be held in most circumstances; usually neither the defendant nor the government can afford to carry the criminal justice process through to its supposed natural conclusion in a full-blown, well prepared trial.[155]

153. And to those in foreign common-law jurisdictions. Neither the English nor the Canadian legal systems have adopted the rule. Martin, *The Exclusionary Rule Under Foreign Law—Canada*, 52 J.Crim.L.C. & P.S. 271 (1961); Williams, *The Exclusionary Rule Under Foreign Law—England*, 52 J.Crim.L.C. & P.S. 272 (1961).

154. About one third of federal defendants going to trial file Fourth Amendment suppression motions; most of these have formal hearings on these motions. Comptroller General of the United States, Impact of the Exclusionary Rule on Federal Criminal Prosecutions, Rep.No. GGD-79-45 (19 April 1979). Because most criminal justice is meted out by the states, and because state officers are frequently less well trained and effectively disciplined than federal officers, the true impact of the exclusionary

remedy may be mostly at the state rather than the federal level.

155. *See generally* L. Weinreb, Denial of Justice 71–86 (1977). A recent report under the headline "*99% of Felony Arrests in the City Failed to Bring Terms in State Prison*" in the *New York Times* provides a dramatic example of our current plight. The article explains that "[T]he 100,000 felony cases each year enter what the Mayor's criminal justice coordinator, Robert G. M. Keating, describes as a 'huge felony funnel,' in which they must vie for limited prosecutorial and court resources.... [L]aw enforcement officials have decided to treat all but the most serious offenses as misdemeanors, more often than not by a plea agreement reaching during arraignment." N.Y. Times, 4 Jan. 1981, Section 1, at 1.

Instead, we have come increasingly to rely on an informal system of negotiated settlements in the form of plea bargained arrangements between prosecutor and defendant. The results are woeful. Criminals guilty of grievous offenses routinely are permitted to escape with convictions for crimes far less serious carrying only wrist-slapping penalties.[156] Meanwhile innocent defendants who might well have been vindicated at trial are coerced into settling for a conviction on a lesser charge; the dire consequences of recalcitrance in bargaining often pose too great a risk to an innocent defendant who fears he may be erroneously convicted after a trial conducted by an ill-compensated and ill-prepared defense lawyer.[157]

It is against this background that we must measure the diversion of energy, talent and dollars from the central task of fairly determining the guilt and innocence of defendants into the work of adjudicating whether the police have blundered. Plainly, what we have in the way of prosecutors, judges and legal aid attorneys has been spread too thin to permit the allocation of these scarce resources to the discipline of the police. That function should be performed elsewhere and by others. The exclusionary remedy thus literally buys what little in the way of Fourth Amendment protection it affords at the cost of more trials for criminal defendants. Even if the rule did a fair job of promoting Fourth Amendment values, this would be at best a questionable bargain.

But in fact, far from enhancing Fourth Amendment guarantees, in the long run the exclusionary remedy undoubtedly erodes Fourth Amendment protections. If one

were diabolically to attempt to invent a rule sure slowly to undermine the substantive reach of the Fourth Amendment, it would be hard to do better than the exclusionary rule. Every trial lawyer understands how much easier it is to get a favorable ruling on the law if the facts of your case are attractive and your client, cosmetic. But the exclusionary rule neatly assures that nearly every Fourth Amendment question litigated involves unsavory facts and disreputable clients. Often, a ruling favorable to a broad reading of the Fourth Amendment will result in the freeing of a criminal plainly guilty of the most heinous offenses to prey once more on the public. Courts are not unaware of the consequences of their rulings; judges cannot help but strain to avoid such an outcome if possible. So whatever short term benefits the rule might achieve by way of additional compliance must be more than counterbalanced by a slow but certain narrowing of the substantive reach of the Fourth Amendment.[158]

### B. *The Rule's Supposed Advantages*

The exclusionary rule thus gratuitously frees criminals to prey on the public, worsens the plight of innocent defendants by reducing the chances that adequate resources will be available to afford them a fair trial, and contributes to the gradual erosion of substantive rights under the Fourth Amendment. What can be said in its favor?

The usual explanation for the exclusionary rule is that it removes whatever incentive there might otherwise be to unconstitutional police conduct, by denying the government the fruits of unlawful searches and seizures.[159] This explanation is some-

---

**156.** In New York City, "[T]he chance of a given felony arrest ending in a sentence to state prison is about 1 of 108, according to statistics compiled by the Police Department." N.Y. Times, 4 Jan 1981, Section 1, at 1.

**157.** The Supreme Court has said that it is constitutionally permissible to accept a guilty plea from a defendant who protests his innocence. *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

**158.** Indeed, we can see this process at work in the case before us in which my dissenting colleagues have suggested that the Fourth Amendment does not protect privacy interests in some containers less sturdy than luggage. *See* opinion of Judge Tamm *ante.*

**159.** *E. g., Elkins v. United States*, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960) (The exclusionary rule's "purpose is to deter— to compel respect for the constitutional guaran-

times summarized by saying that the rule serves as a deterrent to police misconduct, though that is not strictly true in most cases even in theory.[169] Not only does the rule fail to levy a penalty directly on the offending officer who violates the Fourth Amendment, but, even assuming that officers can be indirectly motivated by a penalty levied against the prosecutor whose case is weakened by the rule's operation, in most instances had the officer not acted unconstitutionally the suspect would not even have been arrested and the policeman would not have "cleared" his case. On the other hand, even under the exclusionary rule, when an officer acts unconstitutionally, though a conviction may not ultimately result, he nonetheless makes an arrest and "clears" his case. So an officer's choice often may be between on the one hand no trophy in the form of an arrest but no violation of the Constitution either, and, on the other hand, a cleared case but perhaps an unclear conscience about the methods required to clear it. The possibility of a conviction may be remote either way.[161]

In fact, in view of the remarkably low fraction of felony defendants who wind up in jail, experienced officers may well view a jail sentence that follows an arrest as a rare, random and unexpected occurrence. If so, the exclusionary rule will be simply immaterial to their conduct, which in any event is not predicated on much hope for eventual conviction and imprisonment of the offender.

Whether the rule in fact reduces the incidence of police misconduct is a matter of continuing empirical dispute; there is evidence that it does not, but it is probably fair to say that the question has not been

definitively answered and probably never will be.[162] And because the impact of the rule falls on the prosecutor, not on the policeman, it is hard to see why in theory the rule could be more than marginally effective. The government is not a monolith; in most jurisdictions the policeman and the prosecutor belong to separate bureaucracies. Actions taken against one may not even be effectively communicated to the other.

However uncertain is the rule's efficacy in eliminating unconstitutional behavior by the police, it *is* clear that the rule is likely to discourage the type of internal disciplinary action by police supervisors that would be far more effective in regulating police behavior than the rule itself. With the rule in place, any internal discipline of a police officer is sure to have the incidental effect of sabotaging the prosecution's case before it begins. A prosecutor armed only with evidence of dubious value because it is the fruit of a search of doubtful constitutional validity, may still be able to obtain a plea-bargained conviction on a lesser offense. But if, by disciplining the policeman, the government admits the unconstitutionality of the search, even this chance evaporates. While the rule is based on the assumption that disciplining the police is more important than chastising criminals, few police supervisors are likely to share this assumption. Effective internal discipline is thus shortcircuited. In sum, the rule's value in reducing the incidence of unconstitutional police behavior is at best doubtful. At worst, the rule may actually be counterproductive.

Moreover, even assuming, as I am not prepared to do, that the rule is of some

---

ty in the only effectively available way—by removing the incentive to disregard it.").

**160.** The empirical basis of the rule is the subject of extended and inconclusive debate. For a sample of the scholarly literature on this question see Oaks, *Studying the Exclusionary Rule in Search and Seizure,* 37 U.Chi.L.Rev. 665 (1970); Spiotto, *Search and Seizure: An Empirical Study of the Exclusionary Rule and Its Alternatives,* 2 J. Legal Stud. 243 (1973); Canon, *Is the Exclusionary Rule in Failing*

*Health?, Some New Data and a Plea Against a Precipitous Conclusion,* 62 Ky.L.J. 681 (1974); Comment, *On the Limitations of Empirical Evaluations of the Exclusionary Rule: A Critique of the Spiotto Research and United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).

**161.** *See* notes 155–56 *supra.*

**162.** *See* note 160 *supra.*

marginal benefit in removing an incentive to police misconduct, at present its penalty is administered with a sense of proportionality reminiscent of those medieval penal systems that prescribed capital punishment for everything from pickpocketing on up. The rule falls mercilessly on evidence deemed to have been seized unconstitutionally, without regard for the gravity of the police misconduct or the seriousness of the crime of which the defendant has been charged. Even if the policeman's actions were only marginally in violation of the Constitution despite his good faith while the criminal is guilty of rape and murder, still the evidence stays out. Such a disproportion would be regarded as barbaric if used to deter crime; ironically, employed to deter the police many apparently consider it "progressive."

Perhaps the rule's most serious flaw, however, is that *it is available only to the guilty who may thereby escape conviction.* An innocent citizen whose rights are infringed can receive no benefit from the exclusionary remedy. He must be a provably guilty criminal to take advantage of it.

### C. *Where Can We Go From Here?*

With these long-recognized defects, it is hard to understand how the rule has survived. The reason, I think, is that the rule, with all its faults, has been perceived as the *only* remedy federal judges and justices could fashion unaided by the legislature or the executive. In the past the federal judiciary has been relatively powerless to set up effective deterrent mechanisms to check police abuses. So federal judges who took seriously their oath to uphold the Constitution may have felt compelled to grasp at the straw of the exclusionary rule to carry out their duty in what they perceived as the only way they could. Certainly the last refuge of the rule's supporters has always

been that better, more appropriate remedies historically have not been forthcoming from those in the coordinate branches of the government who do have the power to fashion more effective tools to deal with the problem of police abuse.[163]

I would argue that the existence of the exclusionary rule itself has retarded the development of alternative remedies by the legislative or executive branches. But whether or not I am correct in this judgment, as a result of recent decisions the federal judiciary no longer is dependent on the coordinate branches to fashion better remedies. More potent and effective measures are now at our disposal as a result of recent changes in the law.[164]

In particular, effective tort remedies in federal court could now be developed—and to some degree are already available—to check police abuses, and could be further strengthened by court decisions without legislative or executive assistance. The key here is the resurrection of 42 U.S.C. § 1983 for the redress of constitutional violations by state officials,[165] coupled with the imposition of vicarious liability on state governmental units for the actions of their agents.[166] Taken together, these developments in civil rights law provide not only a federal forum but a state pocket deep enough to assure adequate compensation for and deterrence of Fourth Amendment violations.

Other than the all-too-obvious faults of the exclusionary rule itself, there are several reasons why lawyers and courts interested in the vindication of Fourth Amendment rights should turn away from the exclusionary rule toward the development of effective tort remedies.

Most obvious is the fact that *a tort remedy compensates the victim* of a Fourth

**163.** See, e. g., Kamisar, *The exclusionary rule in historical perspective: the struggle to make the Fourth Amendment more than 'an empty blessing,'* 62 Judicature 337 (1979).

**164.** See, e. g., Wilkey, *A call for alternatives to the exclusionary rule: let Congress and the trial courts speak,* 62 Judicature 351 (1979).

**165.** *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

**166.** *Monell v. Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

Amendment violation, while the exclusionary rule acts solely as an ill-conceived deterrent to future violations whose windfall incidental benefits are made available only to those charged with crime. The exclusionary rule merely deters, and when that deterrence fails, as it almost always must, no compensation is forthcoming for the victims. An effective tort remedy not only deters, but also compensates the victim when and if deterrence fails to achieve lawful police conduct.

Second, the tort remedy has the advantage that it could depend on jury decisionmaking rather than judicial decisionmaking. Judges have been notably unsuccessful in their effort to create a body of principled and coherent rules on which the police can rely to determine the reasonableness of a search with or without a warrant under the Fourth Amendment. The circumstances under which searches are made vary too greatly and the number of relevant factors is too large to permit the "reasonable" search to be captured adequately in a few understandable and administrable rules. What is "reasonable" in one community at one time may not be "reasonable" in another community at another time. Juries drawn from the very community affected by both police abuses and criminal attacks could be expected to provide better and surely more popularly acceptable resolutions of Fourth Amendment cases, just as juries rather than judges traditionally have been expected to provide more accurate and more acceptable resolutions of disputes over what constitutes negligence in the multitude of concrete circumstances that arise. Just as with negligence actions, of course, constitutional tort actions decided by juries would be subject to the usual array of devices designed to control jury decisionmaking to ensure that it remains within the bounds of the rational and the lawful. Among other tools, jury instructions, directed verdicts and judgments notwithstanding the verdict, would be as available for consti-

tutional tort actions as they are for negligence tort actions.

Verdicts by juries composed of peers drawn from the affected communities would not go unnoticed either by police officials or by their supervisors and would effectively deter police misconduct in a way the exclusionary rule will never do. Nor could the police as easily disparage the judgments of their fellow citizens as they can that of appointed judges. At the same time, we can count on juries composed of citizens who live in a community to understand the realities and dangers of life in that community better than judges may and more accurately to evaluate the conflicting claims of reasonableness and unreasonableness of the police and of the aggrieved subject of a search.

I do not underestimate the difficult questions of law, particularly in the area of damages, that must be answered before such a tort system could be considered well developed and mature. But the problems should be no more difficult than those posed by the crush of exclusionary rule cases now clogging the courts. And while the exclusionary rule cannot ever be expected to work, a tort system aimed at the twin goals of reasonable compensation and deterrence might well provide a way out of our current Fourth Amendment difficulties. The time has come to replace the exclusionary rule and replace it with a more effective alternative. Both tasks are within the reach of judges and justices.[167] There is no reason to wait any longer.

---

**167.** Congressional action surely would be preferable. The congressional silence following Chief Justice Burger's call for such legislation, *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 411–27, 91 S.Ct. 1999, 2012–20, 29 L.Ed.2d 619 (1971) (Burger, C.J., dissenting), however, has been thundering.